OHIO CONSUMERS' COUNSEL, APPELLANT, *v.* PUBLIC UTILITIES COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 111 Ohio St.3d 300, 2006-Ohio-5789.]

(Nos. 2005–0518 and 2005–0946—Submitted April
25, 2006—Decided November 22, 2006.)

PFEIFER, J.

## Background

{¶ 1} This is an appeal as of right by appellant, Ohio Consumers' Counsel ("OCC"), from orders of the Public Utilities Commission of Ohio ("commission" or "PUCO") in case Nos. 03–93–EL–ATA, 03–2079–EL–AAM, 03–2081–EL–AAM, and 03–2080–EL–ATA. Cincinnati Gas & Electric Company ("CG & E") was the applicant in all four cases, and OCC and Industrial Energy Users–Ohio ("IEU–O") were intervening parties. CG & E and IEU–O are intervening appellees in this appeal.

{¶ 2} Am.Sub.S.B. No. 3, 148 Ohio Laws, Part IV, 7962 ("S.B. 3") restructured Ohio's electric-utility industry to increase retail competition in the generation component of electric service. S.B. 3 required each Ohio electric utility to file a transition plan with the commission that included a rate-unbundling plan providing for separation of the generation, transmission, and distribution components of electric service. See R.C. 4928.31. S.B. 3 provided for a transition period, termed the "market development period," during which an electric utility's rates were subject to regulatory requirements. The maximum transition period permitted by statute was five years, ending December 31, 2005. R.C. 4928.01(A)(17) and (29) and 4928.40.

{¶ 3} On August 31, 2000, the commission approved CG & E's transition plan. *In re Application of Cincinnati Gas & Electric Company for Approval of its Electric Transition Plan, etc.,* case Nos. 99–1658–EL–ETP et seq. The order provided for a market development period ending no earlier than December 31, 2005, for residential customers. The market development period for nonresidential customers was to end when 20 percent of the load of each such class switched the purchase of its generation supply, but no later than December 31, 2005, the maximum transition period permitted by statute. See R.C. 4928.40(B)(2).

{¶ 4} On January 10, 2003, CG & E filed an application to modify its nonresidential generation rates to provide for market-based-standard-service-offer pricing and to establish an alternative competitive-bid process after its market development period ended. *In re Application of Cincinnati Gas & Electric Company to Modify its Nonresidential Generation Rates to Provide for Market–Based Standard Service Offer Pricing, etc.*, case No. 03–93–EL–ATA. Numerous parties intervened in that case, including OCC and IEU–O. The commission consolidated that case with other related CG & E applications, case Nos. 03–2079–EL–AAM, 03–2081–EL–AAM, and 03–2080–EL–ATA (collectively, the "rate-stabilization-plan cases").

{¶ 5} On December 9, 2003, the commission advised CG & E to file a "rate stabilization plan" as part of the proceedings because the competitive retail market for electric generation had not fully developed in the CG & E territory. On April 22, 2004, a public hearing was held in Cincinnati. An evidentiary hearing commenced on May 17, 2004, but was adjourned because of ongoing settlement discussions. On May 19, 2004, CG & E presented a stipulation it had reached with several, but not all, of the parties to the proceedings that, if approved, would resolve all of the issues in the rate-stabilization-plan cases. The parties to the stipulation included, among others, CG & E, the commission staff, and IEU–O. OCC opposed the stipulation.

{¶ 6} On May 20, 2004, hearings resumed. OCC made an oral motion to compel discovery from CG & E relating to alleged side agreements among CG & E and its affiliates with other parties to the stipulation. A PUCO attorney examiner denied OCC's discovery motion.

{¶ 7} CG & E and others presented testimony in support of the stipulation, and OCC and others presented evidence opposing the stipulation. The hearings concluded on June 1, 2004. Posthearing briefs and letters from consumers were filed.

{¶ 8} On September 29, 2004, the commission issued its opinion and order approving the stipulation with modifications. The order required, among other things, commission approval for changes in certain cost components, more avoidability of certain charges by shopping customers, and full corporate separation by CG & E if it failed to implement the stipulation as modified. The commission also affirmed the attorney examiner's denial of OCC's discovery motion.

{¶ 9} Several parties, including CG & E and OCC, filed applications for rehearing. In its application for rehearing, CG & E accepted some of the commission's modifications and proposed others. The commission, after reviewing CG & E's alternative proposal, found that with certain clarifications and

revisions, CG & E's modifications were meritorious. OCC's application for rehearing was denied.

{¶ 10} OCC and others filed applications for a second rehearing. The commission denied OCC's second rehearing application on January 19, 2005. The commission issued a third rehearing entry on April 13, 2005. The commission's second and third rehearing entries further refined CG & E's rate-stabilization plan.

{¶ 11} Following the commission's second rehearing entry, OCC filed its notice of appeal in case No. 2005–0518. Following the commission's third rehearing entry, OCC filed a notice of appeal, case No. 2005–0946. We consolidated these appeals because identical issues are raised in each case.

## Standard of Review

{¶ 12} "R.C. 4903.13 provides that a PUCO order shall be reversed, vacated, or modified by this court only when, upon consideration of the record, the court finds the order to be unlawful or unreasonable." *Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, at ¶ 50. We will not reverse or modify a PUCO decision as to questions of fact where the record contains sufficient probative evidence to show that the commission's decision was not manifestly against the weight of the evidence and was not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty. *Monongahela Power Co. v. Pub. Util. Comm.*, 104 Ohio St.3d 571, 2004-Ohio-6896, 820 N.E.2d 921, at ¶ 29. The appellant bears the burden of demonstrating that the PUCO's decision is against the manifest weight of the evidence or is clearly unsupported by the record. Id. Although we have "complete and independent power of review as to all questions of law" in appeals from the commission, *Ohio Edison Co. v. Pub. Util. Comm.* (1997), 78 Ohio St.3d 466, 469, 678 N.E.2d 922, we may rely on the expertise of a state agency in interpreting a law where "highly specialized issues" are involved and "where agency expertise would, therefore, be of assistance in discerning the presumed intent of our General Assembly." *Consumers' Counsel v. Pub. Util. Comm.* (1979), 58 Ohio St.2d 108, 110, 12 O.O.3d 115, 388 N.E.2d 1370.

## Proposition of Law No. 1

### *Procedural Integrity of Alternative Proposal*

{¶ 13} In proposition of law No. 1, OCC contends that the commission failed to meet certain procedural requirements when it granted, in part, CG & E's first application for rehearing. On September 29, 2004, the commission issued the original order approving, with a number of modifications, the stipulation regarding CG & E's rate-stabilization plan. CG & E filed an application for rehearing

opposing some of the modifications. In its application, CG & E made an "alternative proposal," which OCC refers to as the "new proposal," [1] suggesting additional modifications of the commission's order. The commission found that CG & E's proposed modifications, with certain clarifications and revisions, were meritorious and approved them.

{¶ 14} OCC maintains that CG & E's first application for rehearing did not set forth specific grounds challenging the reasonableness or lawfulness of the commission's order as R.C. 4903.10 requires. Rather, OCC claims that CG & E's alternative proposal was an application filled with "new charges, terms, and conditions" and argues that it was improper as a matter of posthearing pleading. OCC contends that the commission was required to adhere to the statutory procedural protections set forth in R.C. 4928.14(A), 4928.15(A),[2] 4909.18, and 4909.19 before it approved CG & E's alternative proposal.

{¶ 15} We conclude that the commission did not fail to adhere to any required procedural protections. The commission treated CG & E's alternative proposal as an assignment of error on rehearing and not as a new or separate proposal. The commission determined that subject to certain clarifications and modifications, CG & E's first assignment of error, i.e., the alternative proposal, should be sustained. The commission merely modified its opinion and order just as it might do based on any other party's arguments on rehearing. Under R.C. 4903.10(B), if the commission determines upon rehearing that its "original order or any part thereof is in any respect unjust or unwarranted, or should be changed," it can abrogate or modify the order. The commission also has discretion under this section to decide whether a subsequent hearing is necessary to take additional evidence.

{¶ 16} OCC characterizes CG & E's alternative proposal as an application for a rate increase and claims that the commission was required to comply with the procedures—public notice, a staff investigation, and a hearing—set forth in R.C. 4909.18 and 4909.19. We conclude, however, that CG & E's alternative proposal was not an application for a rate increase as contemplated by R.C. 4909.18. That statute provides:

{¶ 17} "Any public utility desiring to establish any rate, joint rate, toll, classification, charge, or rental, or to modify, amend, change, increase, or reduce any existing rate, * * * shall file a written application with the public utilities commission."

---

1. We will refer to CG & E's proposed modifications as the "alternative proposal."

2. R.C. 4928.15(A) is not relevant to this matter, as it concerns noncompetitive retail electric distribution service as opposed to competitive retail electric generation service.

{¶ 18} The commission has discretion under R.C. 4909.18 in determining whether an application seeks a rate increase. R.C. 4909.18 applies to increases of an "existing" rate charged by a utility. Here, although the commission's order approved CG & E's rate as a market-based standard service offer, that rate had not yet been implemented. Even if the commission's approval of CG & E's alternative proposal amounted to a rate increase over the market-based standard service offer approved in its original order, it was not an increase of an existing rate. The notice, investigation, and hearing requirements of R.C. 4909.19 are not triggered because they apply only upon application for a rate increase pursuant to R.C. 4909.18, which we have determined did not occur.

{¶ 19} Moreover, OCC seemingly ignores the fact that the commission provided notice and held extensive hearings in this matter. CG & E initiated this matter under R.C. 4928.14(A), which requires that a market-based standard service offer "shall be filed with the public utilities commission under section 4909.18 of the Revised Code." A hearing is required in two instances: (1) when an application for an increase in an existing rate is filed or (2) if the application is not for an increase in an existing rate, if the proposals in the application appear "unjust or unreasonable." R.C. 4909.18 and 4909.19. The commission provided notice and held hearings using the "unjust and unreasonable" standard when it considered CG & E's proposed rate-stabilization-plan stipulation. OCC has not shown that the commission abused its discretion by failing to hold additional hearings on CG & E's alternative proposal.

{¶ 20} Finally, OCC not only challenges the commission's handling of this matter on statutory procedural grounds, but claims that a lack of notice and hearing constituted violations of due process as well. We have repeatedly held that there is no constitutional right to notice and hearing in rate-related matters if no statutory right to a hearing exists. See *Consumers' Counsel v. Pub. Util. Comm.* (1994), 70 Ohio St.3d 244, 248–249, 638 N.E.2d 550; *Armco, Inc. v. Pub. Util. Comm.* (1982), 69 Ohio St.2d 401, 409, 23 O.O.3d 361, 433 N.E.2d 923; *Cleveland v. Pub. Util. Comm.* (1981), 67 Ohio St.2d 446, 453, 21 O.O.3d 279, 424 N.E.2d 561.

{¶ 21} We conclude that, in relation to CG & E's alternative proposal, the commission did not violate any of the procedural requirements set forth in R.C. 4928.14(A), 4909.18, or 4909.19, or any due process guarantees.

## Justification for Modifications on Rehearing

{¶ 22} OCC also contends in proposition of law No. 1 that the commission failed to comply with the requirements of R.C. 4903.09 because it approved CG & E's alternative proposal without any evidentiary support in the record and without setting forth the reasons supporting that decision. R.C. 4903.09 provides that

"[i]n all contested cases heard by the public utilities commission * * * the commission shall file * * * findings of fact and written opinions setting forth the reasons prompting the decisions arrived at, based upon said findings of fact."

{¶ 23} We have held that "[i]n order to meet the requirements of R.C. 4903.09, therefore, the PUCO's order must show, in sufficient detail, the facts in the record upon which the order is based, and the reasoning followed by the PUCO in reaching its conclusion." *MCI Telecommunications Corp. v. Pub. Util. Comm.* (1987), 32 Ohio St.3d 306, 312, 513 N.E.2d 337. Although strict compliance with the terms of R.C. 4903.09 is not required, " '[a] legion of cases establish[es] that the commission abuses its discretion if it renders an opinion on an issue without record support.' " *Tongren v. Pub. Util. Comm.* (1999), 85 Ohio St.3d 87, 90, 706 N.E.2d 1255, quoting *Cleveland Elec. Illum. Co. v. Pub. Util. Comm.* (1996), 76 Ohio St.3d 163, 166, 666 N.E.2d 1372.

{¶ 24} Under the stipulation approved by the commission's original order, CG & E's market-based standard service offer consisted of two components: the price-to-compare component and the provider-of-last-resort ("POLR") component. The price-to-compare component represents that portion of the market-based standard service offer that consumers switching to a competitive retail electric service provider may avoid paying to CG & E. The POLR component, which the commission refers to as the "unavoidable" or "nonbypassable" component, represents charges incurred by CG & E for risks associated with its statutory obligation under R.C. 4928.14(C) as the default provider, or provider of last resort, for customers who opt for another provider who then fails to provide service. See *Constellation NewEnergy*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, at ¶ 39, fn. 5.

{¶ 25} These components are themselves made up of separate components. The POLR component comprises a rate-stabilization-charge component and an annually adjusted component. The annually adjusted component was designed to maintain adequate electric capacity reserves in excess of expected demand and to recover costs associated with homeland security, taxes, environmental compliance, and emissions allowances. Neither CG & E nor the commission identified the purpose of the rate-stabilization charge. Nevertheless, the charge is self-defining, and the signatory parties agreed to it.

{¶ 26} In its first application for rehearing, CG & E proposed modifying the stipulation approved by the commission's order. Under CG & E's proposal, the POLR component would include four components. In addition to the rate-stabilization charge and the annually adjusted component, the POLR component would also include an "infrastructure maintenance fund" component and a "system reliability tracker" component. The infrastructure-maintenance-fund charge was intended "to compensate CG & E for committing its generation assets

to serve market-based standard service offer consumers." The system reliability-tracker was intended to permit CG & E "to recover its annually committed capacity, purchased power, reserve capacity, and other market costs necessary to serve market-based standard service offer consumers." CG & E suggested other changes as well, and after reviewing these suggestions, the commission found that with certain clarifications and revisions of its own, CG & E's proposed modifications were meritorious.

{¶ 27} OCC contends that the commission's modifications to its order were not simple adjustments made upon further consideration on rehearing. OCC claims that the commission violated R.C. 4903.09 when it approved on rehearing certain charges and made other modifications to its order without record evidence and without setting forth any basis for the decision.

{¶ 28} We agree. The portion of the commission's first rehearing entry approving CG & E's alternative proposal is devoid of evidentiary support. There are no citations to the record supporting the commission's modifications on rehearing. In addition, the commission did not sufficiently set forth its reasoning for the changes on rehearing. Instead, it merely asserted, without further justification, that the modifications would provide rate certainty for consumers, ensure financial stability for CG & E, and further encourage the development of competitive markets.

{¶ 29} CG & E maintains that the evidence presented to the commission in the May hearings supported the commission's modifications on rehearing because CG & E's alternative proposal contained the same components as the litigated stipulation. According to CG & E, the stipulation, as modified by the order, and the alternative proposal, as modified by the commission's first rehearing entry, contained the same price-to-compare and POLR components. CG & E's argument ignores the commission's approval of the infrastructure-maintenance fund as a component of the POLR without reference to record evidence and without explanation. In fact, aside from defining the purpose and amount of recovery allowed to CG & E from the infrastructure-maintenance fund, the commission offered no factual basis or other justification for approving this charge.

{¶ 30} CG & E claims that the infrastructure-maintenance fund, together with the system reliability tracker, represented the reserve capacity charge previously set forth in the stipulation as part of the annually adjusted component. Although this may be true, we have found nothing in the commission's first rehearing entry to support that assertion. Under the commission's rehearing entry, CG & E's costs for maintaining adequate reserve capacity are now covered by the system-reliability tracker. The commission did not mention the infrastructure-maintenance fund—which is intended to compensate CG & E for committing its generation capacity to serve consumers who choose the market-based standard

service offer through 2008—in the context of maintaining adequate reserve capacity requirements. In that respect, the infrastructure-maintenance fund may be some type of surcharge and not a cost component. Without explanation from the commission, however, we cannot know for certain. In any event, even if we accepted CG & E's claim as true, that would not excuse the commission from its statutory obligation to justify its orders.

{¶ 31} We are also troubled that the commission's first rehearing entry set the "baseline" for determining certain cost components in the alternative proposal—the system-reliability tracker, annually adjusted component, and the "fuel and economy purchased power" component—without any record support and without any explanation. The commission did clarify that it would review the reasonableness of expenditures in these categories by requiring CG & E to establish levels for these cost components for subsequent years. Nevertheless, the commission allowed CG & E to preset the amount of the annually adjusted component for 2005 and 2006 without record evidence or explanation. It is impossible to make any determination about the reasonableness of these components without evidence and explanation from the commission.

{¶ 32} CG & E also defends the commission's approval of its alternative proposal by asserting that it merely resulted in an increased price to compare—the price shopping consumers may avoid paying to CG & E—thereby enhancing the development of the competitive market, and set the various unavoidable POLR charges at much lower levels. The commission did find that the modifications on rehearing would increase the price to compare for all shoppers and would further increase the price to compare by making the annually adjusted component permanently avoidable for an increased percentage of consumers.[3] But the commission did not make any finding on rehearing that the POLR charges were lower.

{¶ 33} We concede that moving the emission allowance from the annually adjusted component to the price-to-compare component, as the commission's first rehearing entry did, would seemingly lower the POLR, because the annually adjusted component is a component of the POLR. In addition, increasing the percentage of consumers who could avoid paying the annually adjusted component would apparently lower the POLR because, under the alternative proposal, the annually adjusted component becomes an avoidable component of the price to compare for that percentage of shoppers who switch to an alternate generation provider. But it is not clear whether other modifications, such as the introduc-

---

3. The commission stated that the percentage of consumers who could avoid the annually adjusted component "was increased by the [September 29, 2004] opinion and order from 25 percent to 50 percent." It appears, however, that the commission's order altered only the rate stabilization charge and not the annually adjusted component.

tion of the unavoidable infrastructure-maintenance-fund charge, the system-reliability-tracker charge (which may or may not be avoidable in subsequent years), and presetting the annually-adjusted-component charge for 2005 and 2006, would increase or decrease the nonbypassable POLR charge.

{¶ 34} We have held that the commission may modify orders as long as it justifies those changes. *Consumers' Counsel v. Pub. Util. Comm.* (1984), 10 Ohio St.3d 49, 50–51, 10 OBR 312, 461 N.E.2d 303. "On the other hand, PUCO orders which merely made summary rulings and conclusions without developing the supporting rationale or record have been reversed and remanded." *MCI Telecommunications*, 32 Ohio St.3d at 312, 513 N.E.2d 337.

{¶ 35} In this matter, the commission made several modifications on rehearing without any reference to record evidence and without thoroughly explaining its reasons. The commission approved the infrastructure-maintenance-fund charge without evidentiary support or justification. The commission approved other modifications without citing evidence in the record and with very little explanation. The commission cannot justify the modifications made on rehearing merely by stating that those changes benefit consumers and the utility and promote competitive markets. The commission's reasoning and the factual basis supporting the modifications on rehearing must be discernible from its orders.

{¶ 36} For these reasons, we hold that the commission failed to comply with the requirements of R.C. 4903.09 when it modified its September 29 order on rehearing. Accordingly, we remand this matter to the commission for further clarification of all modifications made in the first rehearing entry to the order approving the stipulation. On remand, the commission is required to thoroughly explain its conclusion that the modifications on rehearing are reasonable and identify the evidence it considered to support its findings.

Proposition of Law No. 2

{¶ 37} In proposition of law No. 2, OCC challenges the commission's factual finding that CG & E offered a market-based standard service offer as required by R.C. 4928.14(A) and Ohio Adm.Code 4901:1–35. OCC's argument focuses on the commission's order that approved the stipulation and the modifications to that order in the first rehearing entry.

*Order Approving CG & E's Market–Based Standard Service Offer*

{¶ 38} R.C. 4928.14(A) provides that "[a]fter its market development period, an electric distribution utility in this state shall provide customers, on a comparable and nondiscriminatory basis within its certified territory, a market-based standard service offer of all competitive retail electric services necessary to maintain essential electric service to consumers, including a firm supply of electric generation service."

{¶ 39} Ohio Adm.Code 4901:1–35–02(C) provides that an electric distribution utility "may propose a plan for a standard service offer * * * that varies from these rules where there is substantial support from a number of interested stakeholders."

{¶ 40} CG & E and other parties signed a stipulation that proposed a rate-stabilization plan that would govern CG & E's generation rates following the end of the market development period. CG & E's rate-stabilization plan provided for a market-based standard service offer made up of two components: (1) a price-to-compare component and (2) the POLR component.

{¶ 41} In making its original determination that CG & E's standard service offer was market based, the commission focused primarily on the price-to-compare component of CG & E's standard service offer. The price-to-compare component represents that portion of the standard service offer that consumers switching to a competitive retail electric service provider can avoid paying to CG & E. The commission considered testimony comparing the price to compare under the stipulation to three other rates to determine whether the price to compare was consistent with other market prices. CG & E witness Judah L. Rose compared the stipulated price to compare with (1) the rate that CG & E offered with its initial application in this proceeding, along with various adjustments to account for market conditions, (2) generation rates offered by other Ohio electric distribution utilities, and (3) the actual rates at which some competitive retail electric providers have contracted to provide retail service.

{¶ 42} After considering data and arguments from OCC and others attempting to refute CG & E's evidence, the commission found that CG & E's standard service offer was a market-based rate. The commission stated that (1) R.C. 4928.14 allowed it flexibility in approving methods for determining market-based rates for standard service offers, (2) the stipulation was negotiated among five suppliers and other organizations representing various categories of consumers, from low-income residential consumers to large industrial users, (3) the stipulation allowed for modifications to reflect changes in certain costs, and (4) revisions to the stipulation would allow the commission to monitor prices and confirm that prices will remain market based over time.

{¶ 43} The burden is on OCC to show that the commission's decision is against the manifest weight of the evidence or is clearly unsupported by the evidence. *AK Steel Corp. v. Pub. Util. Comm.* (2002), 95 Ohio St.3d 81, 86, 765 N.E.2d 862. OCC has failed to show that the commission's finding was unsupported by the evidence so as to be unlawful or unreasonable. See R.C. 4903.13.

{¶ 44} We hold that the commission's finding that CG & E's standard service offer was market based is supported by sufficient probative evidence. As already noted, CG & E's standard service offer was made up of two components: the

price-to-compare and the POLR. The commission analyzed testimony about the price to compare from CG & E witness Rose and considered the objections and evidence in opposition to his testimony. We have recognized the commission's duty and authority to enforce the competition-encouraging statutory scheme of S.B. 3, and we have accorded due deference in this regard to the commission's statutory interpretations and expertise in establishing and modifying rates. *Migden–Ostrander v. Pub. Util. Comm.*, 102 Ohio St.3d 451, 2004-Ohio-3924, 812 N.E.2d 955, at ¶ 23. OCC has offered no evidence or argument to refute the commission's decision that CG & E has provided a "comparable and nondiscriminatory" rate under R.C. 4928.14(A).

*Modifications on Rehearing to Market–Based Standard Service Offer*

{¶ 45} OCC claims that the commission can no longer rely on the fact that the stipulation was negotiated among several parties to determine that the standard service offer was market based, because the modifications approved on rehearing changed the standard service offer. It is true, as OCC claims, that CG & E's alternative proposal on rehearing was not presented in the form of a stipulated agreement as was CG & E's rate-stabilization plan. We do not consider this fact, standing alone, to be fatal to the commission's finding on rehearing that CG & E's standard service offer remained market based.

{¶ 46} First, the fact that CG & E's rate-stabilization plan resulted from a stipulation negotiated among several competitors in retail electric service and various categories of consumers was not the sole criterion relied on by the commission in finding that the standard service offer was market based. Second, the stipulation included a provision that allowed any signatory party to withdraw and void the rate-stabilization plan should the commission reject or modify any part of the stipulation. None of the signatory parties exercised its option to void the agreement despite significant modifications made by the commission to the original stipulation.

{¶ 47} OCC also claims that the standard service offer under CG & E's alternative proposal is not a market-based rate under R.C. 4928.14(A) any more than was the rate approved by the commission under the stipulation. The commission's modifications on rehearing to the price to compare, however, appear to have altered that component in a manner that would promote competition. For example, the commission modified its order to increase the price to compare for all shoppers by moving the cost-of-emissions allowances from the POLR component to the price-to-compare component. It further increased the price to compare by making the annually adjusted component permanently avoidable for a percentage of each class of consumers. The commission found that increasing the price to compare would encourage further development of competitive markets.

{¶ 48} We have explained in past cases that we "will not reverse an order of the Public Utilities Commission unless the party seeking reversal demonstrates the prejudicial effect of the order." *Tongren*, 85 Ohio St.3d at 92, 706 N.E.2d 1255; *Myers v. Pub. Util. Comm.* (1992), 64 Ohio St.3d 299, 302, 595 N.E.2d 873. OCC has not demonstrated harm or prejudice with respect to the commission's changes on rehearing to the price-to-compare component. Accordingly, we reject OCC's second proposition of law.

Proposition of Law No. 3

{¶ 49} In proposition of law No. 3, OCC claims that CG & E's rate-stabilization plan does not provide for a competitive bidding process as required by R.C. 4928.14(B) and Ohio Adm.Code 4901:1–35. OCC claims that the law requires CG & E to offer customers the option to purchase power at a competitively bid rate and that CG & E's rate-stabilization plan has provided for a competitive bid only as a "test."

{¶ 50} R.C. 4928.14(B) provides that after the market development period, "each electric distribution utility also shall offer customers within its certified territory an option to purchase competitive retail electric service the price of which is determined through a competitive bidding process." This section also provides that "[t]he commission may determine at any time that a competitive bidding process is not required, if other means to accomplish generally the same option for customers is readily available in the market and a reasonable means for customer participation is developed."

{¶ 51} OCC concedes that R.C. 4928.14(B) allows utilities to avoid providing a competitively bid rate if there are "other means to accomplish generally the same option" but contends that CG & E's rate-stabilization plan does not comply. The commission found, however, that CG & E's plan offers "a reasonable alternative to a more traditional competitive bidding process, provides for a reasonable means of customer participation through the various options that are open to customers under the [plan], and fulfills the statutory requirements for a competitive bidding process."

{¶ 52} In lieu of a competitively bid price, CG & E's rate-stabilization plan utilized the price to compare—the price shopping consumers may avoid paying to CG & E—to evaluate the market price for CG & E's service area. The plan allows the commission at any time to implement a competitive bidding process to test CG & E's price to compare against the market price. If the price to compare is significantly different from the test bid price, either the commission or CG & E may begin discussions with all parties to continue, amend, or terminate the rate-stabilization plan.

{¶ 53} We approved a somewhat similar alternative to the competitive-bid process in *Constellation*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, at ¶ 44–49. The stipulation in *Constellation* provided for "ongoing Commission review of market-based rates, through a competitive bidding process, if necessary" and provided that "if market-based rates do not reasonably reflect the rates established by the Stipulation, then the Commission may terminate the [rate stabilization plan] and trigger a competitive bidding process * * *." Id. at ¶ 48.

{¶ 54} Like the plan in *Constellation*, CG & E's rate-stabilization plan, as approved by the commission's order and as modified on rehearing, provides customers with a reasonable means of customer participation as R.C. 4928.14(B) requires. Various incentives were provided to consumers in the form of shopping credits.[4] Moreover, consumers could bypass certain charges, such as the rate-stabilization charge, the annually adjusted component, and the system-reliability tracker.

{¶ 55} OCC also claims that the commission erred in not following its own rules regarding the competitive bidding process. See Ohio Adm.Code Chapter 4901:1–35. Ohio Adm.Code 4901:1–35–02(B) provides that the commission may waive the requirements of the chapter for good cause shown or upon its own motion. Ohio Adm.Code 4901:1–35–02(C) allows electric distribution utilities to propose plans for a "competitive bidding process that varies from these rules where there is substantial support from a number of interested stakeholders."

{¶ 56} We conclude that the commission's approval of CG & E's alternative to the competitive bidding process was reasonable and lawful. The commission found that CG & E's price to compare, as part of the standard service offer, was market based, and OCC has offered no evidence to contradict that finding. Various customer groups were parties to the stipulation and approved the price to compare and the method by which the price to compare would be tested to ensure that it remains market based. CG & E's rate-stabilization plan provides for a reasonable means of customer participation. Finally, there appears to be significant competition in CG & E's service area through the presence of five competitive electric retail service providers. For these reasons, we reject OCC's third proposition of law.

## Proposition of Law No. 4

{¶ 57} In the fourth proposition of law, OCC contends that the commission's order and first entry on rehearing approving CG & E's rate-stabilization plan permit discriminatory treatment of customers in violation of R.C. 4905.32 through

---

4. A "shopping credit" is an incentive to consumers to obtain competitive retail electric generation service from a provider other than an incumbent electric distribution utility. *Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, at ¶ 30.

4905.35. OCC argues that the commission's decision to allow the first 25 percent of switched residential load customers to avoid paying the rate-stabilization charge of the nonbypassable POLR component is discriminatory because consumers who are not in the first 25 percent cannot avoid the charge. OCC also alleges that the rate-stabilization plan is discriminatory because it allows residential customers who have already switched to a competitor when the plan goes into effect to avoid the rate-stabilization charge automatically.

{¶ 58} OCC relies on R.C. 4905.32, 4905.33, 4905.34 and 4905.35. R.C. 4928.05(A)(1) provides that "[o]n and after the starting date of competitive retail electric service, a competitive retail electric service supplied by an electric utility * * * shall not be subject to supervision and regulation * * * by the public utilities commission under [R.C.] Chapters 4901. to 4909. * * *, except * * * division (B) of 4905.33, and [R.C.] 4905.35." R.C. 4905.33(B) is inapplicable because OCC makes no claim under that provision that CG & E is furnishing "free service or service for less than actual cost for the purpose of destroying competition." R.C. 4905.35(A) provides that "[n]o public utility shall make or give any undue or unreasonable preference or advantage to any person, firm, corporation, or locality, or subject any person, firm, corporation, or locality to any undue or unreasonable prejudice or disadvantage."

{¶ 59} In *AK Steel Corp.*, 95 Ohio St.3d 81, 765 N.E.2d 862, we rejected arguments similar to those made by OCC here. In that case, AK Steel argued that shopping incentives in the form of shopping credits were discriminatory under R.C. 4905.35(A) because the credit was higher for the first 20 percent of those in each class who switch to an electric marketer. We held that "although customers who take the early initiative to shop for an alternate supplier of generation will benefit from their actions, the benefit does not amount to undue preference or discrimination, because all customers will have an equal opportunity to take advantage of the shopping incentives." Id. at 87, 765 N.E.2d 862.

{¶ 60} In this matter, OCC has offered no argument or evidence to contradict the commission's conclusion that all residential consumers will have an equal opportunity to avoid the rate-stabilization charge. Thus, based on our decision in *AK Steel,* we reject OCC's argument.

{¶ 61} Moreover, OCC is not asking us to eliminate this particular shopping incentive but, rather, to require the commission to allow all shoppers to avoid the rate-stabilization charge. Decisions on the level of shopping incentives, however, are within the discretion of the commission. See *Constellation,* 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, at ¶ 34. OCC's argument in this regard is speculative; there is no way to prove that limiting the percentage of residential customers who may avoid the rate-stabilization charge to 25 percent will cut off

later shopping. According to the commission, the percentage of residential consumers who are shopping has never approached the 25 percent level.

{¶ 62} OCC has not met its burden of showing that the provision allowing a certain percentage of residential customers who shop to avoid the rate-stabilization charge is discriminatory. Therefore, we overrule proposition of law No. 4.

## Proposition of Law No. 5

{¶ 63} OCC maintains that the commission violated R.C. 4909.18, 4928.15, and 4928.38 by approving nonbypassable charges for those customers switching to competitive retail electric service providers without requiring a rate case and without statutory authorization. OCC complains that the infrastructure-maintenance fund, system-reliability tracker, rate-stabilization charge, and annually adjusted component are anticompetitive charges and that the commission lacked statutory authorization to approve them. OCC essentially claims that these charges should be avoidable by shopping customers.

{¶ 64} R.C. 4928.14(A) requires an electric distribution utility, after its market development period, to provide consumers within its certified territory "a market-based standard service offer of all competitive retail electric services necessary to maintain essential electric service to consumers, including a firm supply of electric generation service."

{¶ 65} R.C. 4928.14(C) provides that "[a]fter the market development period, the failure of a supplier to provide retail electric generation service to customers within the certified territory of the electric distribution utility shall result in the supplier's customers, after reasonable notice, defaulting to the utility's standard service offer filed under division (A) of this section until the customer chooses an alternative supplier."

{¶ 66} Under the stipulation providing for the rate-stabilization plan, the signatory parties agreed upon an unavoidable POLR charge to compensate CG & E for its statutory obligation to provide last-resort services to consumers in its area. The POLR charge comprised two components: the rate-stabilization charge and the annually adjusted component. Under CG & E's alternative proposal, the POLR charge was modified to include two additional components: an infrastructure-maintenance fund and the system-reliability tracker.

{¶ 67} In its order, the commission held that the annually adjusted component did not create a subsidy by shopping customers for standard-service-offer customers because CG & E has expenses related to its statutory obligation to provide POLR service, which the annually adjusted component was intended to offset. Similarly, the commission noted on rehearing that the system-reliability tracker was designed to allow CG & E to recover expenses related to its POLR obligation. The commission never specifically addressed the rate-stabilization

charge or the infrastructure-maintenance fund, but the same reasoning would apply because these are also components of the POLR charge.

{¶ 68} We conclude that the commission's decision in this regard was not unlawful. Under R.C. 4928.14(A) and (C), an electric distribution utility, such as CG & E, has an obligation to ensure generation supply for customers not being served by a competitive retail electric service provider by offering a market-based standard service offer that establishes prices for that supply. The standard service offer would apply to customers who choose not to shop for an alternative supplier and to those who shop and return to CG & E for electric generation services. We have traditionally deferred to the judgment of the commission in situations involving the commission's special expertise. See *AT & T Communications of Ohio, Inc. v. Pub. Util. Comm.* (1990), 51 Ohio St.3d 150, 154, 555 N.E.2d 288. Indeed, we recently agreed with the commission's determination that similar charges were legally sustainable and could reasonably be applied to all customers. See *Constellation*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, at ¶ 36–40.

{¶ 69} OCC also claims that nothing in the record justifies the level of the nonbypassable charges and that the commission failed to comply with procedural protections in R.C. 4909.18 and 4928.15 for reviewing noncompetitive services. We addressed these arguments in our discussion of the first proposition of law. Moreover, the commission rejected OCC's argument that the annually adjusted component, the infrastructure-maintenance fund, and the system-reliability tracker were noncompetitive services. Instead, the commission found that these components were part of CG & E's competitive electric generation charges and were not charges on distribution or transmission services under R.C. 4928.15. "Due deference should be given to statutory interpretations by an agency that has accumulated substantial expertise and to which the General Assembly has delegated enforcement responsibility." *Weiss v. Pub. Util. Comm.* (2000), 90 Ohio St.3d 15, 17–18, 734 N.E.2d 775, citing *Collinsworth v. W. Elec. Co.* (1992), 63 Ohio St.3d 268, 272, 586 N.E.2d 1071. For these reasons, we overrule proposition of law No. 5.

### Proposition of Law No. 6

{¶ 70} OCC contends that the commission approved provisions of the rate-stabilization plan and alternative proposal that allow CG & E to improperly avoid its corporate separation obligations in violation of R.C. 4928.17.

{¶ 71} Under its 2000 electric-transition-plan opinion, the commission approved CG & E's modified corporate separation plan, which provided for the transfer of its generating assets to an exempt wholesale generator no later than December 31, 2004. See *In re Application of CG & E for Approval of Its Electric Transition Plan*, case No. 99–1658–EL–ETP (Aug. 31, 2000), 45–47. CG & E's

rate-stabilization plan included a provision that CG & E would not be required to transfer generating assets to an electric wholesale generator by the end of 2004. The commission approved this provision, finding that it was reasonable for CG & E to retain its generating assets during the period it is committed to provide stabilized rates. According to the commission, it would be inappropriate to ask CG & E to stabilize its rates and then deny it the ability to do so. The commission, therefore, amended CG & E's corporate separation plan to allow it to retain its generating assets through 2008. Thus, the commission's approval of this provision amended CG & E's corporate separation plan as approved by the 2000 electric-transition-plan opinion.

{¶ 72} OCC is apparently arguing that the commission violated R.C. 4928.17(A) by not requiring CG & E to transfer its generating assets by December 31, 2004, as CG & E's corporate separation plan provided. The commission has discretion to approve an alternative functional corporate separation plan for an interim period upon a determination of "good cause." See R.C. 4928.17(C) ("The commission shall issue an order approving or modifying and approving a corporate separation plan under this section, to be effective on the date specified in the order, only upon findings that the plan reasonably complies with the requirements of division (A) of this section and will provide for ongoing compliance with the policy specified in section 4928.02 of the Revised Code. However, for good cause shown, the commission may issue an order approving or modifying and approving a corporate separation plan under this section that does not comply with division (A)(1) of this section but complies with such functional separation requirements as the commission authorizes to apply for an interim period prescribed in the order, upon a finding that such alternative plan will provide for ongoing compliance with the policy specified in section 4928.02 of the Revised Code").

{¶ 73} OCC acknowledges the commission's authority under R.C. 4928.17(C) to approve a modified corporate separation plan. OCC, nevertheless, contends that the commission's discretion to approve a modified separation plan "to apply for an interim period" is not unlimited as to time. OCC complains that CG & E has already operated under a "functional separation plan" for five years under the 2000 electric-transition-plan opinion. Now CG & E has proposed to extend that plan for an additional three years under the rate-stabilization plan. According to OCC, this results in an unfair competitive advantage and illegal preference to CG & E.

{¶ 74} OCC has failed to offer any legal authority or evidentiary proof to support its claims. Under R.C. 4928.17(C), the commission's discretion is limited only by the "good cause" standard and the requirement that the commission find that "such alternative plan will provide for ongoing compliance with the policy

specified in" R.C. 4928.02. OCC has not supported its claims of competitive disadvantage and undue preference with any testimony or other evidence in the record. The commission's "good cause" determination under R.C. 4928.17(C) was a factual determination, and OCC has offered no evidence to show that the commission's finding is against the manifest weight of the evidence or is clearly unsupported by the record. See *AK Steel*, 95 Ohio St.3d at 85–86, 765 N.E.2d 862.

{¶ 75} OCC claims that the doctrine of collateral estoppel bars relitigation of CG & E's electric-transition-plan case from 2000. According to OCC, the provision requiring CG & E to divest its generating assets by December 31, 2004, cannot be modified because the issue of corporate separation was already determined in the earlier case. OCC waived this issue by not setting forth this specific ground in its first application for rehearing. See R.C. 4903.10; *Consumers' Counsel v. Pub. Util. Comm.*, 70 Ohio St.3d at 247, 638 N.E.2d 550. Even if it had preserved this issue, OCC's collateral-estoppel claim is without merit. Collateral estoppel precludes the relitigation of a point of law or fact that was at issue in a former action between the same parties and was passed upon by a court of competent jurisdiction. See *Consumers' Counsel v. Pub. Util. Comm.* (1985), 16 Ohio St.3d 9, 10, 16 OBR 361, 475 N.E.2d 782. The doctrine is inapplicable here because there was no relitigation in this matter of a point of law or fact that was passed upon by the commission in the 2000 electric-transition-plan case. The corporate separation issue addressed in that case was whether CG & E could delay transferring its generating assets from December 31, 2000, to the end of 2004. The issue in this matter—whether CG & E should be allowed to amend its corporate separation plan to allow it to retain generating assets through 2008—was not decided in the electric-transition-plan case. These cases involved different pricing plans, different time periods, i.e., the market development period and the succeeding period, and different reasons for approving a modified corporate separation plan.

{¶ 76} OCC has not met its burden of showing that the commission's order in this instance was unlawful or unreasonable. R.C. 4928.17(C) expressly grants the commission discretion to approve alternative corporate separation plans. We overrule OCC's sixth proposition of law.

## Proposition of Law No. 7

{¶ 77} OCC claims that the commission erred when it did not permit the discovery of undisclosed agreements between CG & E and the signatory parties that were not made part of the stipulation. OCC contends that the commission violated R.C. 4903.082 and Ohio Adm.Code 4901–1–16 when it denied its discovery request.

{¶ 78} In May 2004, OCC requested production of documents from CG & E for all agreements entered into on or after January 26, 2004, between CG & E and the parties to the matters before the commission. At a hearing, after it became clear that CG & E would not comply with the request for documents, OCC orally moved for an order to compel. The examiner denied OCC's motion to compel, citing commission precedent that the existence of side agreements was not relevant to the commission's determination as to the reasonableness of the proposed stipulation and because, to the extent that side agreements involved settlement discussions, they were privileged. The commission upheld the examiner's ruling on the same basis.

{¶ 79} OCC argues that the commission cannot make a reasonableness determination regarding the stipulation without knowing whether side agreements existed among the stipulating parties and the terms of those agreements. The reasonableness test considers whether the settlement was a product of serious bargaining among capable, knowledgeable parties, whether the settlement benefits ratepayers and the public interest, and whether the settlement package violates any important regulatory principle or practice. *Constellation*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, at ¶ 8.

{¶ 80} In *Constellation*, we rejected exactly this argument as applied to the second and third prongs of the reasonableness test. Id. at ¶ 10–15. In that case, we upheld the commission's decision that alleged side agreements were not discoverable because the information sought by discovery—information related to the negotiation of the proposed stipulation—was privileged. We further agreed with the commission that the information sought was not relevant to whether the stipulation satisfied the second and third criteria for testing reasonableness. Id. at ¶ 14–15. Based on this reasoning, we uphold the commission's denial of OCC's discovery request to the extent that the relevance of the information sought was based on the second and third prongs of the reasonableness test. As the commission noted in *Constellation*, "no agreement among the signatory parties to the stipulation can change the terms of the stipulation. Either the terms of the stipulation are, on their face, beneficial to the ratepayers and the public or they are not. Even if there were side agreements among the signatory parties, those agreements would not change the public benefit or detriment of the stipulation." Id. at ¶ 14.

{¶ 81} The remaining issue, which was not raised in *Constellation*, is whether the commission erred in denying discovery of side agreements requested by OCC as relevant to the first test of reasonableness: whether the settlement is a product of serious bargaining among capable, knowledgeable parties. We hold that the commission erred in this regard.

{¶ 82} We have "complete and independent power of review as to all questions of law" in appeals from the commission. See *Luntz Corp. v. Pub. Util. Comm.* (1997), 79 Ohio St.3d 509, 512, 684 N.E.2d 43. Ohio Adm.Code 4901–1–16(B) provides that "any party to a commission proceeding may obtain discovery of any matter, not privileged, which is relevant to the subject matter of the proceeding. It is not a ground for objection that the information sought would be inadmissible at the hearing, if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." R.C. 4903.082 provides that "[a]ll parties and intervenors shall be granted ample rights of discovery. The present rules of the public utilities commission should be reviewed regularly by the commission to aid full and reasonable discovery by all parties. Without limiting the commission's discretion the Rules of Civil Procedure should be used wherever practicable." See, also, R.C. 4903.22.

{¶ 83} The text of Ohio Adm.Code 4901–1–16(B), the commission's discovery rule, is similar to Civ.R. 26(B)(1), which governs the scope of discovery in civil cases. Civ.R. 26(B) has been liberally construed to allow for broad discovery of any unprivileged matter relevant to the subject matter of the pending proceeding. *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638, 661, 635 N.E.2d 331 ("The purpose of Civ.R. 26 is to provide a party with the right to discover all relevant matters, not privileged, that are pertinent to the subject of the pending proceeding"). See *Disciplinary Counsel v. O'Neill* (1996), 75 Ohio St.3d 1479, 664 N.E.2d 532 ("Pursuant to Civ.R. 26(B)(1), a party may obtain discovery regarding non-privileged information relevant to the claim or defense of a proceeding. This includes determining the existence of documents and the identity of persons having knowledge of any discoverable matter").

### *Relevancy to "Serious Bargaining" Criterion*

{¶ 84} OCC argues that the existence of side agreements could be relevant to a determination that the stipulation was not the product of serious bargaining. OCC suggests that if CG & E and one or more of the signatory parties agreed to a side financial arrangement or some other consideration to sign the stipulation, that information would be relevant to the commission's determination of whether all parties engaged in "serious bargaining." We agree.

{¶ 85} The commission found that "serious bargaining did occur, among capable, knowledgeable parties" and that "[m]ultiple bargaining sessions, open to all parties, took place before the commencement of the hearings." The commission noted that testimony at the hearing indicated that all parties participated in negotiating sessions, although not all parties signed the stipulation. The existence of side agreements between CG & E and the signatory parties entered into around the time of the stipulation could be relevant to ensuring the integrity and openness of the negotiation process. Although the commission's most recent

decisions have denied discovery of side agreements, in the past, the commission has allowed their disclosure based on this same reasoning. See *In re Joint Application of SBC Communications, Inc. et al. for Consent and Approval of a Change of Control,* case No. 98–1082–TP–AMT (Apr. 9, 1999) 7.

{¶ 86} Both the commission and intervenor IEU–O contend that the possible existence of separate, undisclosed agreements among some of the parties is irrelevant to the commission's evaluation of the reasonableness of the stipulation. They urge this court to conclude that the commission's reasonableness review is limited to the written stipulation, just, according to them, as we did in *Constellation.* Whether the stipulation was the product of serious bargaining, however, was not addressed in *Constellation* and cannot be resolved solely by reviewing the proposed stipulation. The commission cannot rely merely on the terms of the stipulation but, rather, must determine whether there exists sufficient evidence that the stipulation was the product of serious bargaining. Any such concessions or inducements apart from the terms agreed to in the stipulation might be relevant to deciding whether negotiations were fairly conducted. The existence of concessions or inducements would seem particularly relevant in the context of open settlement discussions involving multiple parties, such as those that purportedly occurred here. If there were special considerations, in the form of side agreements among the signatory parties, one or more parties may have gained an unfair advantage in the bargaining process. Therefore, we hold that the commission erred in denying discovery of this information based on lack of relevancy.

*Privilege*

{¶ 87} The commission and the intervenors also argue that recent commission precedent and this court's decision in *Constellation* support their position that side agreements are not discoverable because they are privileged. In *Constellation,* we upheld the commission's practice of denying discovery of side agreements on the commission's belief that these agreements are privileged. *Constellation,* 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, at ¶ 14–15. For the following reasons, we modify that ruling.

{¶ 88} *Constellation* was this court's review of a case involving an application by the Dayton Power & Light Company for an extension of its market development period. See *In re Continuation of Rate Freeze & Extension of Market Dev. Period for Dayton Power & Light Co.,* case No. 02–2779–EL–ATA (Sept. 2, 2003). In that case, the commission cited *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.* (C.A.6, 2003), 332 F.3d 976, as persuasive authority and held that side agreements, "being information related to the negotiation of the proposed stipulation," are privileged. In *Goodyear,* the Sixth Circuit recognized a "settlement privilege" under federal law that protects statements made in furtherance of settlement from third-party discovery. Id. at 980–982.

{¶ 89} Although federal case law such as *Goodyear* is not binding on this court with regard to interpreting the Civil Rules, it can be instructive where, as here, Ohio's rule is similar to the federal rule. See *First Bank of Marietta v. Mascrete, Inc.* (1997), 79 Ohio St.3d 503, 508, 684 N.E.2d 38. Fed.R.Civ.P. 26(b)(1) and Ohio Civ.R. 26(B)(1) are substantially similar. We do not find *Goodyear* persuasive, however, and decline to recognize a settlement privilege applicable to Ohio discovery practice.

{¶ 90} The court in *Goodyear* crafted a new settlement privilege under Fed.R.Evid. 501 that protects settlement communications from third-party discovery. *Goodyear*, 332 F.3d at 980–982. There is no broad consensus of support, in federal courts or in other states, for such a privilege. See *In re Subpoena Issued to Commodity Futures Trading Comm.* (D.D.C.2005), 370 F.Supp.2d 201, 207–210. The Sixth Circuit appears to be the only circuit court of appeals to recognize such a privilege. See *In re Subpoena Duces Tecum Issued to Commodity Futures Trading Comm.* (C.A.D.C.2006), 439 F.3d 740, 754 (declining to assess the merits of a privilege claim novel "in this circuit and in all but one other circuit court of appeals").

{¶ 91} Moreover, the settlement privilege in *Goodyear* is grounded solely in federal law. *Goodyear*, 332 F.3d at 979–980. *Goodyear* was a diversity case, however, and should have been governed by the controlling state privilege law. Under Fed.R.Evid. 501, in cases where state law supplies the rule of the decision, such as a diversity-jurisdiction matter, "the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law." See *Samuelson v. Susen* (C.A.3, 1978), 576 F.2d 546, 549–551; *Home Indemn. Co. v. Lane Powell Moss & Miller* (C.A.9, 1995), 43 F.3d 1322, 1328. See, also, *Grupo Condumex, S.A. de C.V. v. SPX Corp.* (N.D.Ohio 2004), 331 F.Supp.2d 623, 629, fn. 3 (stating that *Goodyear*, as a diversity case, should have applied the state law of privilege).

{¶ 92} Privilege under Ohio law is governed by statute or "by principles of common law as interpreted by the courts of this state in the light of reason and experience." Evid.R. 501. Yet the commission and intervenors have cited no Ohio statute or case law that expressly creates a "settlement privilege" pertaining to information sought at the discovery stage. Indeed, Evid.R. 408 provides that evidence of settlement may be used for several purposes at trial, making it clear that discovery of settlement terms and agreements is not always impermissible.

{¶ 93} Even if we were to conclude that *Goodyear* was persuasive authority, the commission misapplied its holding in this matter. The absolute privilege recognized in *Goodyear* protects against the disclosure of settlement communications, that is, statements "made during settlement talks." *Goodyear*, 332 F.3d at 979. Here, OCC is not seeking to discover the communications made during

settlement negotiations but, rather, the terms of the side agreements and the agreements themselves. The Sixth Circuit stated that the settlement privilege is absolute but extends only to the underlying discussions made during settlement negotiations and not to the occurrence of settlement talks, the terms of any settlement, or the settlement agreement itself. Id. at 981–982. If there were side agreements, such as contracts negotiated between CG & E and the signatory parties to prevent or conclude further litigation that were not made part of the stipulation, *Goodyear* would not preclude discovery of such information.

{¶ 94} Accordingly, we hold that the commission abused its discretion in barring discovery of side agreements in this matter based on a federal settlement privilege. We remand this matter to the commission and order that it compel disclosure of the requested information. Upon disclosure, the commission may, if necessary, decide any issues pertaining to admissibility of that information.

### Conclusion

{¶ 95} For the reasons explained above, we hold that the commission failed to comply with R.C. 4903.09 by not providing record evidence and sufficient reasoning when it modified its order on rehearing and that the commission abused its discretion when it denied discovery regarding alleged side agreements. Accordingly, the commission's orders are affirmed in part and reversed in part, and this matter is remanded for further consideration consistent with this opinion.

> Orders affirmed in part
> and reversed in part,
> and cause remanded.

MOYER, C.J., RESNICK, LUNDBERG STRATTON, O'CONNOR, O'DONNELL and LANZINGER, JJ., concur.

---

Janine L. Migden–Ostrander, Ohio Consumers' Counsel, and Jeffrey L. Small and Ann M. Hotz, Assistant Consumers' Counsel, for appellant.

Jim Petro, Attorney General, Duane W. Luckey, Senior Deputy Attorney General, and Thomas W. McNamee and Werner L. Margard III, Assistant Attorneys General, for appellee Public Utilities Commission of Ohio.

Paul A. Colbert, Rocco O. D'Ascenzo, James B. Gainer, and Kate E. Moriarty, for intervening appellee Cincinnati Gas & Electric Company.

McNees Wallace & Nurick L.L.C., Samuel C. Randazzo, Daniel J. Neilsen, and Lisa G. McAlister, for intervening appellee Industrial Energy Users–Ohio.