*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 12a0167p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

ANTHONY WILLIAMS; BGR, INC.; MUNAFO,
INC.; AIKIDO OF CINCINNATI,

            *Plaintiffs-Appellants,*

    *v.*

DUKE ENERGY INTERNATIONAL, INC.; DUKE
ENERGY CORPORATION; GENERAL MOTORS
CORPORATION,

            *Defendants-Appellees.*

No. 10-3604

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 08-00046—Edmund A. Sargus, Jr., District Judge.

Argued: January 11, 2012

Decided and Filed:  June 4, 2012

Before:  SILER and GRIFFIN, Circuit Judges; TARNOW, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Paul Michael De Marco, WAITE, SCHNEIDER, BAYLESS & CHESLEY
CO., L.P.A., Cincinnati, Ohio, for Appellants.  Joseph R. Guerra, SIDLEY AUSTIN
LLP, Washington, D.C., for Appellees.  **ON BRIEF:** Paul Michael De Marco, Stanley
M. Chesley, W. B. Markovits, Christopher D. Stock, WAITE, SCHNEIDER, BAYLESS
& CHESLEY CO., L.P.A., Cincinnati, Ohio, Randolph H. Freking, George M. Ruel, Jr.,
FREKING & BETZ, LLC, Cincinnati, Ohio, for Appellants. James E. Burke, W. Jeffrey
Sefton, Cincinnati, Ohio, Peter D. Keisler, Eric D. McArthur, SIDLEY AUSTIN LLP,
Washington, D.C., for Appellees.

---

[*] The Honorable Arthur J. Tarnow, Senior United States District Judge for the Eastern District of
Michigan, sitting by designation.

----

## OPINION

----

TARNOW, District Judge.  Plaintiffs appeal the dismissal of their case pursuant to Fed. R. Civ. P. 12(b)(1).  The district court, following a hearing, found that the "filed-rate doctrine" denied the court federal question subject-matter jurisdiction.  The district court also found that the Public Utilities Commission of Ohio ("PUCO") had exclusive jurisdiction over Defendants' state-law claims, depriving the court of diversity jurisdiction.  The district court granted Defendants' motion to dismiss pursuant to 12(b)(1).  The district court did not assess Defendants' arguments that dismissal was also proper under Fed. R. Civ. P. 12(b)(6).[1]

Plaintiffs raise three issues on appeal.  First, Plaintiffs argue that the PUCO does not have exclusive jurisdiction over the state-law claims raised by Plaintiffs.  Second, Plaintiffs argue that the filed-rate doctrine does not apply to their federal claims.  Third, Plaintiffs argue that even if the district court was correct in dismissing some of Plaintiffs claims under the filed-rate doctrine and because of PUCO's exclusive jurisdiction, the district court should still have considered Plaintiffs' request for injunctive and other non-monetary relief.

For the following reasons, we **REVERSE** the judgment of the district court  and **REMAND** for proceedings consistent with this opinion.

### I. Background

Plaintiffs Anthony Williams, BGR, Inc., Munafo, Inc., and Aikido of Cincinnati, individuals and businesses based in Ohio, brought suit against Defendants Duke Energy International, Inc. and Duke Energy Corporation, retail electricity service providers, alleging violation of the Robinson-Patman Act of 1936, 15 U.S.C. § 13, *et seq.*, Ohio's

----

[1]In a footnote the district court stated that "[a]s to Defendants motions pursuant to Rule 12(b)(6) for failure to state a claim, the Court would find under the filed rate doctrine, Plaintiffs' claims are barred." *Williams v. Duke Energy Int'l, Inc.*, 606 F. Supp. 2d 783, 794 (S.D. Ohio 2009).

Pattern of Corrupt Activity Act, Ohio Rev. Code § 2923.31, *et seq.*, a civil RICO claim pursuant to18 U.S.C. § 1962(c), and common-law claims of fraud and civil conspiracy. Defendant Duke Energy International, Inc.[2] was dissolved in May of 2005, and was a subsidiary of Duke Energy Carolinas, LLC[3] ("Duke"). Plaintiffs' case centers on a subsidiary of Duke Energy Carolinas, Duke Energy Ohio, Inc. ("DEO") and an affiliated company, Duke Energy Retail Sales[4] ("DERS").

Plaintiffs allege that Duke,[5] through subsidiaries and an affiliated company, paid unlawful and substantial rebates to certain large customers, including General Motors, in exchange for the withdrawal by said customers of objections to a rate-stabilization plan that Duke was attempting to have approved by the PUCO.

In 1999, the Ohio General Assembly enacted legislation which "restructured Ohio's electric-utility industry to increase retail competition." *Ohio Consumers' Counsel v. Pub. Util. Comm'n*, 856 N.E.2d 213, 218 (Ohio 2006). The restructuring legislation also provides for a transition "market development period," not to exceed five years, which was to end when specified numbers of customers switched suppliers of electricity. *Id*. After the market-development period, the legislation removed the authority of the PUCO to set electricity rates. *See* Ohio Rev. Code § 4928.05.

On January 10, 2003, Duke Energy International's predecessor-in-interest, Cincinnati Gas & Electric Company ("CGE"), filed an application with the PUCO to establish market-based pricing of electrical rates. *Ohio Consumers' Counsel*, 856 N.E.2d at 219. Thereafter, the PUCO directed CGE to file a proposed rate-stabilization plan ("RSP"). *Id*. at 302. A number of parties filed objections to the proposed RSP, which

---

[2] Preceded by Cincinnati General & Electric ("CGE"). *Ohio Consumers' Counsel v. Pub. Util. Comm'n*, 856 N.E.2d 213, 218-19 (Ohio 2006).

[3] Known at the time of the Complaint as "Duke Energy Corporation."

[4] Successor in interest to Cinergy Retail Services ("CRS").

[5] "Duke" is used as shorthand for Duke Energy Carolinas. Duke Energy Carolinas is the parent company of Duke Energy Ohio and Duke Energy Retail Sales, the subsidiary and affiliated company whom Plaintiffs accuse of wrongdoing.

would govern the rates CGE would be permitted to charge until December 28, 2008. *In re Cincinnati Gas & Elec. Co.*, No. 03-93-EL-ATA, 2007 WL 3197045, at *2 (Ohio Pub. Util. Comm'n, Oct. 24, 2007). These parties included major consumer of electricity such as General Motors as well as the Ohio Consumers' Counsel ("OCC"), which represents Ohio consumers in actions before the PUCO. The hearing was adjourned to facilitate ongoing settlement negotiations. *Ohio Consumers' Counsel*, 856 N.E.2d at 219. Thereafter, CGE filed a stipulation regarding the outstanding rate issues. The stipulation was agreed to by a number of parties, including General Motors, who withdrew their objections to the RSP. *Id.* The OCC opposed the stipulation. *Id.*

Shortly after the stipulation was filed, the OCC sought discovery from CGE to determine whether the utility had entered into side agreements (not filed with the PUCO) in an effort to persuade General Motors and other large consumers to withdraw their objections to the rate-stabilization plan. *Ohio Consumers' Counsel*, 856 N.E.2d at 219. The PUCO denied the request for discovery of any side agreements. *Id.* Both the OCC and CGE requested a rehearing. *Id.* at 220. The PUCO denied the OCC's request for a rehearing on the issue of the side agreements, and accepted some of the alternative aspects of the rate-stabilization plan proposed by CGE. *Id.* A second rehearing request by the OCC was denied on January 19, 2005, and a third on April 13, 2005. *Id.* In the second and third rehearing decisions, the PUCO approved additional modifications to the rate-stabilization plan. *Id.* The OCC appealed to the Ohio Supreme Court. *Id.*

The Ohio Supreme Court unanimously reversed the PUCO's refusal to allow discovery of the side agreements between CGE and the parties that had withdrawn their objections to support the RSP stipulation:

> OCC argues that the existence of side agreements could be relevant to a determination that the stipulation was not the product of serious bargaining. OCC suggests that if [CGE] and one or more of the signatory parties agreed to a side financial arrangement or some other consideration to sign the stipulation, that information would be relevant to the commission's determination of whether all parties engaged in "serious bargaining." We agree . . . . [w]hether the stipulation was the product of serious bargaining . . . cannot be resolved solely by reviewing the proposed stipulation. The commission cannot rely merely on the

terms of the stipulation but, rather, must determine whether there exists sufficient evidence that the stipulation was the product of serious bargaining. Any such concessions or inducements apart from the terms agreed to in the stipulation might be relevant to deciding whether negotiations were fairly conducted . . . [t]herefore, we hold that the commission erred in denying discovery of this information based on lack of relevancy.

*Ohio Consumers' Counsel*, 856 N.E.2d at 234-35.

In addition, the court found that the PUCO had failed to provide its reasoning in allowing additional charges and fees to be included in the rate-stabilization plan after CGE's request for a rehearing. *Id.* at 223-25.

On remand, the PUCO ordered discovery of any documents relevant to side agreements between Duke[6] and its customers[7] that might be relevant to evaluate the seriousness of the bargaining. Thereafter, the PUCO conducted an evidentiary hearing on the issue of whether the rate-stabilization plan was reasonable.

The PUCO expressly rejected the earlier stipulation:

Certain of the parties to the stipulation had signed side agreements that required them to support the stipulation . . . we have limited evidence . . . regarding the willingness of Duke to compromise with parties who may not have been discussing side arrangements . . . we find that the existence of side agreements, in which several of the signatory parties agreed to support the stipulation, raises serious doubts about the integrity and openness of the negotiation process related to that stipulation . . . we now reach the inevitable conclusion that there is a sufficient basis to question whether the parties engaged in serious bargaining and, therefore, that we should not have adopted the stipulation. We now expressly reject the stipulation on such grounds.

*Id.* at *19.

---

[6] In the commission order published following remand from the Ohio Supreme Court, CGE is referred to as "Duke." Duke Energy International was the successor in interest to CGE, and was a subsidiary of Duke Energy Corporation, the latter now being known as Duke Energy Carolinas, LLC.

[7] The side agreements at issue were allegedly between CGE's (at this point Duke's) subsidiary DERS and certain parties to the stipulation. The PUCO found the fact that the contracting party "may have been an affiliate of Duke, rather than [Duke] itself" irrelevant. *In re Cincinnati Gas & Elec. Co.*, 2007 WL 3197045, at *18-19.

However, having rejected the stipulated RSP, the PUCO determined that the Ohio Supreme Court's concerns about particular allowed charges in the plan were "moot" as the stipulation had been rejected. The PUCO then considered the original RSP submitted by Duke on January 26, 2004. The PUCO approved this plan with some modifications. *Id.* at \*20-32.[8]

The OCC again appealed to the Ohio Supreme Court, contending that the PUCO improperly limited the consideration of the side agreements to whether serious bargaining occurred. *Ohio Consumers' Counsel*, 904 N.E.2d at 856-57. The OCC contended that the PUCO should have considered whether Duke engaged in unlawful discounting or discrimination in the supply of electricity. *Id*.

The Ohio Supreme Court upheld the PUCO's decision, finding that the PUCO was not required to investigate Duke's alleged unlawful activities in the context of Duke's application to approve its market-based service rate-stabilization plan:

> Pursuant to our remand, the side agreements were relevant to the commission's evaluation of the serious bargaining aspect of the reasonableness review for stipulations before the commission. Because the side agreements included agreements that the signatory parties would support the stipulation, they raised serious doubts about the integrity and openness of the stipulation-negotiation process . . . [b]ut in the absence of the stipulation, the commission was still required to consider Duke's rate-stabilization application and set the market-based standard service offer. The side agreements are not relevant to this task.

*Id*.

The OCC also challenged substantive aspects of the RSP that had been approved by the PUCO and sought the refund of alleged excessive rates. *Id*. at 857-58. The Ohio Supreme Court granted the PUCO dismissal with respect to this issue, finding that a new RSP had been implemented effective July 31, 2008. *Id.* The court reasoned that it could not remand to the PUCO to enact lower rates because the rate structure at issue was no

---

[8]*See Ohio Consumers' Counsel*, 904 N.E.2d at 861-62 (Pfeifer, J., dissenting) (noting that the plan approved by the PUCO was largely the same plan set forth in the rejected stipulation); *see, supra*, p.7 n.9.

longer in effect, and could not order a refund of rates because such action would constitute "retroactive rate making." *Id.*[9]

Plaintiffs filed the instant suit in the United States District Court for the Southern District of Ohio on January 16, 2008. The district court granted the Motion to Dismiss on March 31, 2009. Plaintiffs timely filed a notice of appeal on April 29, 2010.

## II. Filed-Rate Doctrine

We "review de novo the district court's ruling on a motion to dismiss a claim." *Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008).

"The filed rate doctrine requires that common carriers and their customers adhere to tariffs filed and approved by the appropriate regulatory agencies." *MCI Telecomms. Corp. v. Ohio Bell Tel. Co.*, 376 F.3d 539, 547 (6th Cir. 2004). An example of the doctrine is found in *Louisville & Nashville R.R. Co. v. Maxwell*, 237 U.S. 94 (1915), in which the Supreme Court held that a passenger who purchased a train ticket at an incorrectly low rate due to a misquote by a ticket agent did not have a defense against the subsequent collection of the higher rate by the railroad company. 237 U.S. at 97. In essence, the doctrine precludes a challenge to the reasonableness of the rates of common carriers if the rates have been approved by an appropriate regulatory agency.

We have described the two most important purposes of the filed-rate doctrine as "prevent[ing] carrier discrimination by committing the carriers to one set tariff and preserv[ing] the role of administrative agencies in approving and setting rates, a practice

---

[9]Justice Pfeifer issued a dissent in which he noted that the approved RSP was nearly identical to the rejected stipulated plan that the court had previously found to be flawed, inadequately explained, and not the product of serious bargaining:

> [W]hen [big customers] negotiate a better deal for themselves and stipulate to higher prices for everyone else, this court should carefully consider the circumstances before approving decisions of the [PUCO]. We did just that when we initially remanded this case . . . [t]he problem here is that even though we rejected the stipulation and remanded the case, nothing has changed. The PUCO agreed to essentially the same deal that had been the product of the flawed stipulations. That isn't the way the process is supposed to play out . . . [p]ublic utilities should not be able to hide their pricing. They are, after all, public utilities . . . [p]roviding a lower price to a high-volume user is a legitimate business decision; hiding that lower price is not.

*Ohio Consumers' Counsel*, 904 N.E.2d at 861-62 (Pfeifer, J., dissenting).

at which they are particularly adept." *MCI*, 376 F.3d at 547-48 (citing *Fax Telecommunicaciones Inc. v. AT&T*, 138 F.3d 479, 489 (2d Cir. 1998)).

In *MCI* a telecommunications provider had applied to the PUCO for permission to begin providing telephone services to residents of three Ohio counties. MCI had to negotiate reciprocal compensation rates with Ohio Southern Bell, which also provided telephone service in the area. MCI and Southern Bell submitted the dispute to the PUCO. The PUCO determined that MCI could charge Southern Bell under the higher "tandem" reciprocal compensation rate rather than the lower "end office" rate. On appeal to this court, the PUCO argued that the district court lacked jurisdiction because Southern Bell could not receive a refund for, or challenge, the rates paid to MCI under the filed-rate doctrine. *MCI*, 376 F.3d 545.

This court rejected the PUCO's argument and reversed the district court, finding that the filed-rate doctrine did not apply. This court noted that the first and most important issue was that the appellant, Southern Bell, was not "arguing that the tandem rate itself should be different (i.e., [Southern Bell] is not arguing that the rate is incorrect or was unreasonably set) or that it is per se unreasonable." *Id.* at 547. Rather, "[t]he issue is whether [Southern Bell] is required to pay the tandem rate or the end office rate, which may depend upon the interpretation of the regulations governing symmetrical rates. A ruling by this court will have no effect on the filed tariff or rate. Thus, [Southern Bell] is not challenging the filed tariff, but is merely appealing the arbitration decision that applied one rate rather than another." *Id.*

Thus, this court distinguished between challenging the setting or reasonableness of a specific rate, which is barred by the filed-rate doctrine, and challenges that involve discussion of rates but do not challenge their reasonableness, which are permitted. This court found that a determination regarding whether one rate or the other applied to MCI would not intrude upon the fundamental purposes of the filed-rate doctrine, to prevent carrier discrimination and to preserve the administrative role of agencies in approving and setting rates.

The district court erred in its determination that the Plaintiffs' challenge involved an attack on filed rates. The district court devoted a paragraph to this determination:

> The Plaintiffs contend that their claims involve only rebates and kickbacks which were neither filed with nor approved by the PUCO. The Court disagrees. Whether payments are rebates or kickbacks depends upon an analysis of the filed rate. A party claiming rate discrimination is contending that the effective rate charged one party is too low, while the charges to the plaintiffs are too high.

*Williams v. Duke Energy Int'l, Inc.*, 606 F. Supp. 2d 783, 790 (S.D. Ohio 2009).

The district court's determination that the filed-rate doctrine applies to this case is inconsistent with legal precedent. The district court held that any claim that requires "analysis of [a] filed rate" is barred by the filed-rate doctrine. This is not a correct statement of the filed-rate doctrine. The filed-rate doctrine bars challenges to the reasonableness of a filed rate.

Plaintiffs' challenge does not concern the particular rate set by the PUCO, but rather payments made outside of the rate scheme. Plaintiffs allege that Defendants paid substantial sums of money to certain large customers in exchange for the withdrawal by the large customers of their objections to Defendants' proposed RSP. Plaintiffs contend that this amount to an "indirect rebate" which had the effect of requiring Plaintiffs to pay a higher rate than certain companies which received a rebate. Plaintiffs are arguing that Defendants, in violation of the law, indirectly granted rebates to favored large customers.

Further, as noted by the United States Court of Appeals for the First Circuit, "[i]t is the *filing* of the tariffs, and not any affirmative approval or scrutiny by the agency, that triggers the filed rate doctrine." *Town of Norwood, Mass. v. New England Power Co.*, 202 F.3d 408, 419 (1st Cir. 2000) (citing *Square D Co. v. Niagara Frontier Tariff Bureau, Inc., et al.*, 476 U.S. 409, 417 (1986)) (emphasis in original). In *Square D* the rates were "duly submitted, lawful rates under the Interstate Commerce Act . . . ." 476 U.S. at 417. That is not the case here. This case does not involve the challenge by Plaintiffs of any filed rates. Rather, Plaintiffs challenge the lawfulness and purpose of payments made by Appellee Duke's affiliate DERS pursuant to various side agreements.

Plaintiffs argue that these side agreements were not filed with any agency, including the PUCO, and are unlawful. Defendants have presented no evidence to suggest that the side agreements were filed with any agency, and in fact have made every effort to resist discovery of the agreements or public revelations regarding the specific contents of the side agreements.

Defendants argue that this is a case about "rate discrimination," and that Plaintiffs seeks to challenge "PUCO-approved rates." (Br. of Appellees at 35.) However, as noted by Plaintiffs, "the side agreements at issue and the kickbacks paid pursuant to those agreements were not approved by, filed with, or even supervised by the PUCO . . . ." (Reply Br. of App. at 3.) Nor do the alleged "rebates" or "kickbacks" actually involve a challenge to the reasonableness of any filed rate. Plaintiffs do not challenge whether the rates set by the PUCO were reasonable; rather, they contend that Defendants conspired to aid certain favored companies in avoiding paying the actual filed rate, and that this action on the part of Defendants harmed Plaintiffs by giving the favored companies competitive advantage over Plaintiffs. The allegation that certain large consumers, by receiving a rebate, effectively paid a lower rate than Plaintiffs does not transform this action into an attack on filed rates.

The district court's misreading of the filed-rate doctrine is inconsistent with this court's decision in *MCI*. If the standard for application of the doctrine was any case where "analysis of [a] filed rate" was required, then the doctrine would have barred Southern Bell's claim in *MCI*, which required this Court to examine different filed rates to determine which was the correct filed rate to apply. Indeed, were this Court to adopt Defendants' view of the filed rate doctrine, the railroad appellee in *Louisville & Nashville R. Co. v. Maxwell*, 237 U.S. 94 (1915), would have been unable to collect the full price of its ticket from the ticket-holder appellant in that case, as any court seeking to make the plaintiff pay the full price would have had to engage in "analysis of the filed rate" to determine the rate the plaintiff should have paid. That is not the law.

The district court incorrectly applied the filed-rate doctrine when it held that it lacked jurisdiction to hear Plaintiffs' claims. Because the filed-rate doctrine applies only

in challenges to the underlying reasonableness or setting of filed rates, the doctrine is inapplicable in this case. As "[a] ruling by this court will have no effect on the filed tariff or rate," we follow our precedent in *MCI* and reverse the district court's holding that the filed-rate doctrine deprived it of jurisdiction over this case. *MCI*, 376 F.3d at 547.

### III. Subject-Matter Jurisdiction

We review "questions of subject-matter jurisdiction and statutory interpretation de novo." *Baze v. Parker*, 632 F.3d 338, 341 (6th Cir. 2011) (citing *Mikulski v. Centerior Energy Corp.*, 501 F.3d 555, 560 (6th Cir. 2007)).

The jurisdiction of federal courts is defined by Article III of the United States Constitution and by acts of Congress. It is generally true that the jurisdiction of the federal courts "cannot be limited or taken away by state statutes." 17A Wright, et al., *Fed. Practice & Procedure* § 4211 (3d ed. 2012). Generally, the jurisdiction of a federal court will only be limited by state statute under special circumstances, such as when the federal court sits in diversity pursuant to 28 U.S.C. § 1332. Even in such circumstances, a state cannot defeat federal jurisdiction over a matter by limiting jurisdiction to a specialized state court. *See Marshall v. Marshall*, 547 U.S. 293, 314 (2006) (holding that "jurisdiction of the federal courts . . . 'cannot be impaired by subsequent state legislation creating courts of probate'") (quoting *McClellan v. Carland*, 217 U.S. 268, 281 (1910)). This rule applies even if the cause of action was created by state statute. *Id.* (holding that "'a State cannot create a transitory cause of action and at the same time destroy the right to sue . . . in any court having jurisdiction'") (quoting *Tennessee Coal, Iron & R.R. Co. v. George*, 233 U.S. 354, 360 (1914)).

No circumstances exist here that would deprive the district court of jurisdiction over Plaintiffs' state-law claims. After dismissing Plaintiffs' federal claims, the district court found that it lacked jurisdiction over Plaintiffs' state-law claims because, sitting in diversity as an Ohio court, the PUCO had exclusive jurisdiction over Plaintiffs' state-law claims. However, because we find that the district court erred in dismissing

Plaintiffs' federal claims, federal question subject-matter jurisdiction is available to the district court pursuant to 28 U.S.C. § 1331. The district court's federal question subject-matter jurisdiction is sufficient to allow supplemental jurisdiction over Plaintiffs' state-law tort claims of fraud and civil conspiracy pursuant to 28 U.S.C. § 1367. We therefore need not reach the question of whether the district court sitting in diversity would have jurisdiction over Plaintiffs' state-law claims.

### IV. Claims Under 12(b)(6)

"Whether the district court properly dismissed [a plaintiff's] claims pursuant to Rule 12(b)(6) is a question of law, which we review de novo." *Hensley Mfg., Inc. v. Propride, Inc.*, 579 F.3d 603, 608-09 (6th Cir. 2009).

Defendants sought dismissal for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). Because the district court found that the filed-rate doctrine precluded "all claims of damages allegedly incurred by Plaintiffs," it did not reach or substantively analyze Defendants' 12(b)(6) argument.[10] However, Defendants raise the 12(b)(6) issue on appeal, and Plaintiffs address the 12(b)(6) arguments in their reply brief. This court may address issues raised by the parties on appeal even where the district court has not explicitly ruled on the issues. *See Howard v. Bouchard*, 405 F.3d 459, 476-77 (6th Cir. 2005) (taking up procedural default issue where district court did not decide issue below).

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), Plaintiffs must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. This standard is not "akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting

---

[10]The district court stated in a footnote "[a]s to Defendants motions pursuant to Rule 12(b)(6) for failure to state a claim, the Court would find under the filed rate doctrine, Plaintiffs claims are barred." *Williams*, 606 F. Supp. 2d at 794 n.7.

*Twombly*, 550 U.S. at 545).  Nevertheless, the complaint need not set out the facts in detail; what is required is a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a). Defendants challenge each of Plaintiffs' claims in turn.

### A. Plaintiffs' Robinson-Patman Act Claim

Plaintiffs bring a claim under the Robinson-Patman Act ("RPA"), 15 U.S.C. § 13, *et seq*., which makes it unlawful for persons "engaged in commerce . . . to discriminate in price between different purchasers of commodities of like grade and quality . . . ." The RPA was enacted in response to the comparative competitive advantage of large purchasers, who could induce advertising allowances, rebates, and special services from sellers due to their size.  Small independent stores were at a "hopeless competitive disadvantage" compared to large stores and thus the RPA was enacted "to eliminate these inequities." *FTC. v. Simplicity Pattern Co.*, 360 U.S. 69 (1959).

To survive a motion to dismiss on a RPA claim, a plaintiff  must allege that "(1) the defendant discriminated in price between different purchasers of commodities of like grade and quality, and (2) the effect of that discrimination was to substantially lessen competition or tend to create a monopoly in any line of commerce." *Schwartz v. Sun Co.*, 276 F.3d 900, 903-04 (6th Cir. 2002) (citing *D.E. Rogers Assocs., Inc. v Gardner-Denver Co.*, 718 F.3d 1431, 1438-39 (6th Cir. 1983)).

In their complaint, Plaintiffs allege that Defendant Duke discriminated in price between different purchasers of its sold commodity, electricity (all of which is of like grade and quality), and provide allegations laying out with specificity how this discrimination took place on a continuous basis between Defendants and certain favored commercial customers, within the same geographic market as Plaintiffs, from January 2005 to 2009.  (*See* First Am. Compl. ¶¶ 3, 18, 21-24, 50.)  Plaintiffs also allege the specific amount of price discrimination (in the form of payments or rebates to favored customers) in 2005: $15 million.  (*Id.* ¶ 21.)  One subclass of Plaintiffs, sellers of goods and services, compete in the same market as the favored customers and allege that they

have lost profits as a result of the discriminatory rebates and the competitive advantage thus provided to favored customers.  (*Id.* ¶ 50.)

Defendants first argue that electricity is not a "commodity" within the meaning of the RPA, citing a single district court case, *City of Newark v. Delmarva Power & Light Co.*, 467 F. Supp. 763, 772-74 (D. Del. 1979) (holding that electricity is not a commodity because the RPA uses terms such as "goods, wares, or merchandise" to refer to commodities, terms not commonly applied to electricity, and finding significant Congress' amendment of Federal Power Act to allow for review of rate disparity one year prior to passage of RPA).

However, this court has already indicated support for the proposition that electricity is a commodity under the RPA.  In *Metro Commc'ns Co. v. Ameritech Mobile Commc'ns, Inc.*, 984 F.2d 739, 745 (6th Cir. 1993), this court discussed *City of Kirkwood v. Union Elec. Co.*, 671 F.2d 1173, 1181-82 (8th Cir. 1982), in which the United States Court of Appeals for the Eighth Circuit held that electricity is a commodity as it is "produced, sold, stored in small quantities, transmitted, and distributed in discrete quantities."  This court found that cellular telephone service was not a commodity because it is "very different from electricity.  It cannot be produced, felt, or stored, even in small quantities.  The plaintiffs do not buy a quantity of it, store it, and resell it their customers."  *Metro Commc'ns Co.*, 984 F.3d at 745.  Thus, this court by implication found that electricity, unlike cellular telephone service, was a commodity.  *See also Town of Concord, Mass. v. Bos. Edison Co.*, 676 F. Supp. 396, 397-98 (D. Mass. 1988) (holding that electricity is a commodity because other than being "not an obviously tangible item . . . electricity is not significantly different from other items deemed commodities subject to the price discrimination prohibitions of the antitrust laws . . . electrical energy is a thing bought and sold in the market place"); *City of Gainesville v. Fla. Power & Light Co.*, 488 F. Supp. 1258, 1280-83 (S. D. Fla. 1980) (holding electricity is a commodity because it is a product manufactured from other forms of energy, similar to commodities such as coal and gasoline, and is valued for its physical characteristics rather than legal meaning or ability to provide a service).  We reaffirm

that electricity is a commodity under the terms of the RPA and this court's decision in *Metro Commc'ns Co.*, 984 F.2d at 745.

Defendants next argue that the RPA does not apply because Plaintiffs and the alleged favored customers do not compete in the electricity market; Defendants contend that the RPA "centrally addresses price discrimination in cases involving competition between different purchasers for resale of the purchased product." *Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 169-70 (2006).

Defendants' contention that the RPA applies only to the resale of a purchased product is not consistent with case law. In *FTC. v. Morton Salt Co.*, 334 U.S. 37, 39 (1948), the Supreme Court found that a manufacturer of salt had violated the RPA by discriminating in price between different purchasers. The salt manufacturer had violated the RPA because "the competitive opportunities of certain merchants were injured when they had to pay [the salt manufacturer] substantially more for their goods than their competitors had to pay." *Id.* at 46-47. The situation is precisely the same in this case: Plaintiffs allege that they were injured when they had to pay substantially more for electricity than their competitors due to the rebates provided to some of Defendants' large customers.

Defendants next argue that Plaintiffs fail to adequately allege competitive disadvantage and damage to their business or property. Specifically, Defendants claim that Plaintiffs provide only "unadorned, conclusory allegations. . . ." (Br. of Appellees at 47.)

The Supreme Court has held that "the [RPA] does not require that the discriminations must in fact have harmed competition, but only that there is a reasonable possibility that they 'may' have such an effect." *Corn Prods. Refining Co. v. FTC.*, 324 U.S. 726, 742 (1945). This court endorsed the same view in *Schwartz v. Sun Co., Inc.*, finding that "[b]ecause damage issues in [RPA] cases are rarely susceptible to the kind of concrete, detailed proof of injury which is available in other contexts, the Supreme Court has repeatedly held that . . . the factfinder may conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their

tendency to injure plaintiffs' business . . . that defendants' wrongful acts had caused damage to plaintiffs." *Schwartz*, 276 F.3d at 904 (quoting *Stelwagon Mfg. Co. v. Tarmac Roofing Sys.*, 63 F.3d 1267, 1273-74 (3d Cir. 1995) (internal citations omitted)). Plaintiffs Munafo and BGR, Inc. allege that they have suffered competitive disadvantage compared to certain favored companies as a result of the alleged rebates provided to said companies. (First Am. Compl. ¶ 50.)

Defendants also argue that Plaintiffs do not allege the identity of the "favored" or "disfavored" purchasers, or the effect of the cost of electricity on their sales or profit margins. However, the primary reason that the side agreements and sales to the "favored" purchasers have not been set forth in detail is because discovery has not taken place and this information rests in the hand of the Defendants. Plaintiffs note that the copy of the side agreements they obtained is heavily redacted such that the names of favored companies are not available. Nevertheless, Plaintiffs have identified General Motors as one of the favored companies in their pleadings. (First Am. Compl. at ¶¶ 15, 21.)

We find that Plaintiffs have adequately alleged injury and competitive disadvantage sufficient to survive a 12(b)(6) motion to dismiss with respect to their Robinson-Patman Act claim.

### B. Plaintiffs' RICO Claim

Plaintiffs bring a civil RICO claim pursuant to 18 U.S.C. § 1962(c), making it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which effect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." Plaintiffs allege that Defendant Duke, through its affiliated company DERS, transmitted unlawful rebates to certain favored companies. (First Am. Compl. at ¶¶ 15-21.) Plaintiffs allege that the racketeering activity is primarily mail and wire fraud, but also includes money laundering. (*Id.* ¶¶ 33-40.) Plaintiffs allege that the pattern of repeated acts of mail and wire fraud from 2005 to the present demonstrates a relationship between the predicate acts and continuous criminal activity. (*Id.* ¶¶ 35-39;)

*See H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (holding that in a civil or criminal RICO action, it must be shown that "racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity").

Defendants argue that Plaintiffs do not adequately allege mail or wire fraud as a predicate to racketeering. Defendants argue that bills sent to customers in the mail that stated that "certain electricity charges were mandatory and unavoidable" were "as a matter of indisputable state law . . . true: The various charges Plaintiffs identify must be paid, and Plaintiffs do not allege that any 'favored' customers were excused from this obligation." (Br. of Appellee at 49.)

Plaintiffs respond by noting that, while the fact that the electricity charges at issue had to paid was true, Defendants used these true statements to conceal the alleged fraud. By engaging in secret side agreements with favored customers, Defendants provided rebates to already-paid "mandatory" charges. Plaintiffs also allege that Defendants engaged in wire fraud by receiving and transferring moneys to and from DERS and favored customers in furtherance of a fraudulent scheme. (First Am. Compl. ¶¶ 33-40.)

Defendants argue that Duke had no "duty to disclose" the rebates at issue. (Br. of Appellee at 50.) Defendants cite *Langford v. Rite Aid of Alabama, Inc.*, 231 F.3d 1308, 1314 (11th Cir. 2000), for the proposition that "differential pricing alone is not a fraudulent practice; plaintiffs must assert some particular reason why the relationship . . . was such that non-disclosure of the differential pricing structure constitutes a violation of the mail and wire fraud statutes." As Plaintiffs have pled, Duke's fraud was in asserting through the mail that all customers had to pay "mandatory and unavoidable" electricity charges, implying that all customers paid the same rate (which they were required to do under the RPA). Thus, Plaintiffs allege that Duke's non-disclosure of the side agreements constitutes fraud.

Defendants also cite *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 792 (1st Cir. 1990), for the proposition that an "illegal rebate and kickback scheme . . . did not amount to a scheme to defraud." Defendants omit the reason why,

in *McEvoy*, the illegal scheme was not "a scheme to defraud": the United States Court of Appeals for the First Circuit found that the scheme was not intended to defraud the *plaintiff* who had brought the RICO action. *McEvoy* does not stand for the proposition that Defendants claim, that an "illegal rebate and kickback scheme" can never amount to a scheme to defraud.

Defendants also make brief claims that Plaintiffs fail to plead with particularity as required by Fed. R. Civ. P. 9(b), and that Plaintiffs fail to state a predicate claim for money laundering because money laundering requires money that is the proceed of "some form of unlawful activity." 18 U.S.C. § 1956(a)(1). Defendants argue that the payment of "PUCO-approved rates" to Duke was not unlawful.

With respect to Defendants' 9(b) argument, this court has held that "[i]t is a principle of basic fairness that a plaintiff should have an opportunity to flesh out her claim through evidence unturned in discovery. Rule 9(b) does not require omniscience; rather the Rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim." *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 680 (6th Cir. 1988). "Especially in a case in which there has been no discovery, courts have been reluctant to dismiss the action where the facts underlying the claims are within the defendant's control." *Id.* We find that Plaintiffs have sufficiently set out the alleged fraudulent scheme in such a manner as to put Appellee on notice of the nature of Plaintiffs' claims.

With respect to Defendants' money-laundering argument, the alleged transfer of money from favored customers to Duke, and from Duke to DERS, and from DERS back to the favored customers as "rebates" tainted the funds, which became the "proceeds" of unlawful activities. Mail fraud constitutes an "unlawful activity" according to 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1). Thus, taking as true the allegations that Appellee Duke collected money through its use of the mails and funneled the money to DERS and thereafter back to favored customers in a fraudulent scheme, we find that Plaintiffs have set out a cognizable claim of money laundering based upon the unlawful activity of mail fraud.

Defendants next argue that there is no proximate cause between the alleged racketeering and harm to Plaintiffs. Defendants argue that Plaintiffs' "theory of liability rests on the independent actions of third . . . parties," namely the PUCO, and argue that the remedy sought by Plaintiffs would require the PUCO to enforce the law. We do not agree. Defendants' argument confuses proximate cause between an alleged wrongful act and an injury with the relationship between an alleged wrongful act and the remedy for injury. The PUCO was not the cause of injury to Plaintiffs. Rather, it was Defendants' alleged fraudulent scheme that Plaintiffs contend caused them injury. The fact that Plaintiffs are required to bring a case before the PUCO or this court does not mean that there is a "third party" whose actions disrupt the proximate cause of Plaintiffs' injuries. Defendants' argument that proximate causation is "speculative" because the PUCO might not have found the rebates to be unlawful is similarly incorrect.

We find that Plaintiffs' alleged injuries, as set forth in the First Amended Complaint, are fairly traceable to Defendants, and that Plaintiffs' Civil RICO claim survives a motion to dismiss under 12(b)(6).

### C. Plaintiffs' Corrupt-Practices Claim

Defendants argue that Plaintiffs fail to allege predicates for their Ohio Corrupt-Practices Act claim, Ohio Rev. Code § 2923.3. As we have already held, Plaintiffs have properly alleged money laundering and telecommunications fraud as a predicate to their civil RICO claim. This alone would be enough to satisfy the predicate act requirements of the Ohio Corrupt-Practices Act.

Plaintiffs have also sufficiently alleged that Defendants engaged in obstruction of justice, that is, "communicating false information to any person" for the purpose of hindering discovery of a crime pursuant to Ohio Rev. Code § 2921.32(A). Plaintiffs allege that Defendants' legal counsel "consciously and deceptively denied having any knowledge of the existence of any . . . side deals" in on-the-record proceedings before the Ohio Supreme Court in "a further attempt to hide their wrongdoing." (First Am. Compl. ¶¶ 20, 39.) The selective payment of rebates constitutes a felony under Ohio law. *See* Ohio Rev. Code §§ 4905.32-.33(A), 4905.56, 4905.99. Thus, communicating

false information to any person for the purpose of hindering the discovery of the selective payment of rebates would constitute obstruction of justice.

Defendants argue that the "alleged acts occurred in civil proceedings, and plaintiffs' allegations show at most that they were designed to assist [Duke], and not 'another' as the statute requires." (Br. of Appellees p. 55.) Defendants' arguments are inconsistent with the law. The fact that the alleged obstruction took place in a civil proceeding is irrelevant; the statute contains no requirement that a false statement be made in a criminal proceeding. *See* Ohio Rev. Code § 2921.32(A). Similarly, Defendants' contention that the alleged obstruction was in defense of the corporation does not shield Defendants' counsel from the statute. Even were corporations not considered "persons" for many legal purposes, *see Citizens United v. FEC*, 130 S. Ct. 876 (2010), corporate counsel are not permitted to freely make false statements before a court and evade charges of obstruction of justice.

We find that Plaintiffs have adequately alleged violation of Ohio's Corrupt-Practices Act sufficient to withstand a motion to dismiss under Fed. R. Civ. P. 12(b)(6).

### D. Plaintiffs' Common-Law Fraud Claim

Defendants next challenge Plaintiffs' claim of common-law fraud by recycling their arguments regarding a lack of duty to disclose and a lack of proximate cause between their actions and the injury to Defendants. As we have already held, Plaintiffs have sufficiently argued that Defendants are not free to omit material facts in the commission of mail and wire fraud and have alleged proximate cause between the actions of Defendants and the injury to Plaintiffs.

We therefore find that Plaintiffs have adequately alleged a claim of common-law fraud sufficient to withstand a motion to dismiss under Fed. R. Civ. P. 12(b)(6)

### E. Plaintiffs' Common-Law Civil Conspiracy Claim

Plaintiffs base their common-law civil conspiracy claim on Defendants' alleged conspiracy to violate Ohio Rev. Code § 4905.33(A), which prohibits a public utility from

charging any person or corporation more or less for services, through the use of rebates, than any other person or corporation, and § 4905.35, which prohibits a public utility from giving undue or unreasonable preference, advantage, or disadvantage to any person or corporation.

Defendants argue that Plaintiffs' conspiracy claim fails because, according to Defendants, they are no longer subject to the statutory restrictions prohibiting rebates or special rates in Ohio Rev. Code § 4905.33(A), or the restrictions prohibiting giving undue advantage or disadvantage in § 4905.35. Defendants make this argument based on Ohio Rev. Code § 4928.05(A)(1), enacted in 1999, which states in pertinent part that:

> On and after the starting date of competitive retail electric service, a competitive retail electric service supplied by an electric utility or electric services company shall not be subject to supervision and regulation . . . by the public utilities commission under Chapters 4901. to 4909., 4933., 4935., and 4963. of the Revised Code, except sections 4905.10 and 4905.31, division (B) of section 4905.33, and sections 4905.35 and 4933.81 to 4933.90; except sections 4905.06, 4935.03, 4963.40, and 4963.41 of the Revised Code . . . .

Defendants argue that, by stating that electric services companies "shall not be subject to supervision and regulation . . . by the public utilities commission . . ." the Ohio General Assembly intended to entirely remove electric service companies from the reach of the listed sections of the Ohio Code.[11] Defendants argue that it is implausible that "competitive retail electric service remains subject to all of the requirements governing public utilities, that Chapter 4928 supplements rather than replaces those requirements, and that enforcement power has been transferred from the PUCO to private plaintiffs." (Br. of Appellees at 57.) Defendants contend that the exempted provisions of § 4298.05 "no longer apply to competitive retail electric service." (*Id.*)

Defendants misread the plain language of § 4298.05. Had the Ohio legislature intended to remove competitive electric services completely from the ambit of the

---

[11]This argument is at odds with Defendants' argument that the PUCO retains "authority" to "remedy the underlying wrongs" caused by violation of 4905.33 and 4905.35; it is unclear how the PUCO could remedy harm caused by Defendants under said statutes if Defendants are no longer subject to the very same statutes, as Defendants argue in a separate portion of their brief.

statutes listed in § 4298.05, then the words "by a municipal corporation under Chapter 743, of the Revised Code or by the public utilities commission" are superfluous to the statute. Under Ohio law, "[i]n determining legislative intent it is the duty of [the] court to give effect to the words used, not to delete words used or to insert words not used." *Columbus-Suburban Coach Lines, Inc. v. Public Util. Comm'n of Ohio*, 254 N.E.2d 8, 9 (Ohio 1969). The inclusion of "by the public utilities commission" means that the statute should be read exactly as written: competitive electric services are exempted from the authority of the PUCO under the specific chapters listed. Had the Ohio legislature meant to remove competitive electric services entirely from the reach of the statute, they could have done so with specific language.

Defendants' argument would require this court to ignore the plain language of the statute and inquire into the intent of the legislators of the General Assembly in enacting § 4298.05. Such an inquiry is unnecessary given the plain language of the statute. We find that Ohio Rev. Code §§ 4905.33 and 4905.35 apply to Defendant Duke, and that Plaintiffs have alleged a claim of common-law civil conspiracy sufficient to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6).

## V. Injunctive Relief

Plaintiffs argue that if this court finds that the filed-rate doctrine applied to their federal claims, we could nevertheless provide them with injunctive and non-damage relief. Because we find that the filed-rate doctrine does not apply, we need not decide this question.

## VI. Conclusion

For the foregoing reasons, we **REVERSE** the judgment of the district court and **REMAND** for proceedings consistent with this opinion.