RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0197P (6th Cir.)
File Name: 03a0197p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

THE GOODYEAR TIRE & RUBBER COMPANY,
     *Plaintiff-Appellee,*

*v.*

CHILES POWER SUPPLY, INC.,
d/b/a Heatway Systems,
     *Defendant,*

ROBERT S. JULIAN, et al.,
     *Petitioners-Appellants.*

No. 01-3873

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 97-00335—Dan A. Polster, District Judge.

Argued: March 28, 2003

Decided and Filed: June 16, 2003

Before: BOGGS, SUHRHEINRICH, and SILER, Circuit
Judges.

---

## COUNSEL

**ARGUED:** William W. Maywhort, HOLLAND & HART, Greenwood Village, Colorado, for Appellants. G. Jack Donson, TAFT, STETTINIUS & HOLLISTER, Cincinnati, Ohio, for Appellee. **ON BRIEF:** William W. Maywhort, HOLLAND & HART, Greenwood Village, Colorado, David L. Black, Joseph W. Halpern, HOLLAND & HART, Denver, Colorado, for Appellants. G. Jack Donson, John B. Nalbandian, TAFT, STETTINIUS & HOLLISTER, Cincinnati, Ohio, James K. Archibald, VENABLE, BAETJER, HOWARD & CIVILETTI, Washington, D.C., Kenneth C. Bass III, STERNE, KESSLER, GOLDSTEIN & FOX, P.L.L.C., Washington, D.C., for Appellee.

---

## OPINION

---

SUHRHEINRICH, Circuit Judge. Appellants Robert S. Julian and fifteen other Colorado homeowners ("Julian") intervened in this action and moved the district court to vacate or modify a confidentiality order. Julian now appeals from the district court's June 29, 2001, denial of his petition to vacate the order which prevents either of the named parties in the case of *Goodyear Tire & Rubber Co. v. Chiles Power Supply Co.*, 7 F. Supp. 2d 954 (N.D. Ohio 1998) ("*Goodyear I*"), from discussing the contents of settlement negotiations. The issue presented on appeal is whether statements made in furtherance of settlement are privileged and protected from third-party discovery. We affirm the decision of the district court and find that they are.

I.

Defendant Chiles Power Supply, Inc. d/b/a Heatway Radiant Floors and Snowmelting ("Heatway") is a national

manufacturer of heating and snowmelt systems. Sometime prior to 1995, Heatway purchased a significant amount of "Entran II" rubber hose from Plaintiff-Appellee Goodyear Tire & Rubber Co. ("Goodyear"). Heatway subsequently incorporated the hose into a hydronic radiant heating and snowmelt system, which it then sold to Julian and other homeowners in and around Vail, Colorado.

In 1998, Julian filed suit in federal district court in Colorado against both Goodyear and Heatway after the "Entran II" hose used in Heatway's system failed and caused damage to Julian's property. *See Loughridge v. Goodyear Tire & Rubber Co.*, No. 98-CV-1302 (D. Col. filed June 15, 1998). In that action, Goodyear defends on the ground that the failure of the hose is due to negligent installation and maintenance of the system by the homeowners. Conversely, Heatway argues that the failure is due to a defect in Goodyear's design for the hose. Significantly, Heatway co-founder Daniel Chiles gave a sworn deposition to that effect on October 29, 1997.

Between May 1995 and June 1996, prior to the Colorado lawsuit, Heatway entered into a second contract with Goodyear to obtain Goodyear's newest model rubber hose, presumably for use by Heatway in the same or a similar heating system. However, Heatway refused to pay the $2,093,000 contract price after the "Entran II" failures in Colorado began to surface. On January 21, 1997, Goodyear filed suit against Heatway in Ohio state court for non-payment on the second contract. Heatway removed the case on the basis of diversity jurisdiction to the United States District Court in Akron, Ohio; and counterclaimed, alleging, *inter alia*, breach of implied warranty of merchantability regarding the hose that had failed in Colorado. The district court granted Goodyear summary judgment on the contract, but denied summary judgment on Heatway's counterclaims, and scheduled the case for jury trial. *Goodyear I*, 7 F. Supp. 2d 954. The district court presided over settlement negotiations for the counterclaims, and admonished that all talks were to

remain confidential. The negotiations ultimately proved unsuccessful. On February 4, 2000, the jury returned a verdict for Goodyear on Heatway's counterclaims. Heatway subsequently filed for bankruptcy and did not appeal the decision.

In March 2000, Chiles gave an interview to *Contractor*, a Cleveland, Ohio trade paper. The subsequent article quotes Chiles as saying, in regard to the Ohio litigation:

> [T]he day before this trial began, Goodyear made us an offer. They said, we'll do away with this litigation, we'll give you cash, we'll indemnify you against lawsuits from homeowners and all you have to do is sign this paper and agree that the fault is with homeowners and contractors.

Robert P. Mader, *Goodyear Stunner*, CONTRACTOR MAGAZINE, Mar. 1, 2000, at 1. On March 14, 2000, after a hearing, the Ohio district court determined that Chiles had improperly disclosed confidential statements made during the course of negotiations, and ordered Chiles not to make any more statements about the settlement discussions. In a written order, the court noted that "the content of settlement discussions are always confidential" and may never be disseminated, even after a case is closed. Moreover, to correct Chiles' misstep, the district court gave Goodyear permission to make a statement "in whatever form or fashion it chooses, in response to the statement of Dan Chiles published in *Contractor* Magazine." On May 1, 2000, *Contractor* published Goodyear's response:

> Dan Chiles' statement was false. Heatway knows that where systems using Entran II as a component part had problems, those problems invariably are the result of improper system design, installation, operation or maintenance— not the result of any defect in the hose. Heatway failed to get sufficient information on system installation, operation or maintenance to installers and system users, leading directly to the limited problems that

have occurred with systems in the field. Heatway's attacks on the hose are a cynical effort to misdirect installers, users and the public away from the real problems— problems that Heatway itself in large part created. In settlement negotiations, Heatway indicated it was willing to begin telling system installers and users the truth about the real cause of the problems— but only if Goodyear would make payments to Heatway. Goodyear refused to pay Heatway to tell the truth— something Heatway should have done (and should do) regardless.

*Goodyear Responds to Chiles' Comments*, CONTRACTOR MAGAZINE, May 1, 2000, at 23.

The Colorado case, *Loughridge*, was by then, and is now still, pending. On May 1, 2001, having learned about Chiles' accusations, Julian filed a motion with the Colorado district court seeking to compel Chiles to testify about Goodyear's alleged offer to "buy" Chiles' testimony. On May 15, 2001, without addressing whether settlement communications are always confidential, the Colorado court denied the motion to compel. The court simply held that it lacked jurisdiction to overrule another court's order.

On June 25, 2001, pursuant to Fed. R. Civ. P. 24, Julian joined the instant Ohio case and petitioned the Ohio district court to vacate or modify its confidentiality order and to permit discovery of any statements Goodyear made during settlement talks. Julian argued that any communications should be discoverable, notwithstanding the confidentiality order, because the communications are not privileged and are relevant to Julian's Colorado claim. On June 29, the district court denied the motion, and again found that the content of settlement talks are always confidential. The court relied on the prevailing public policy favoring secrecy in negotiations:

> Public policy favors the settlement of lawsuits, a policy embodied in Rule 408 of the Federal Rules of Evidence.

*See, e.g.*, [Fed. R. Evid. 408, advisory committee note]; *Affiliated Mfrs., Inc. v. Aluminum Co. of Am.*, 56 F.3d 521, 526 (3d Cir. 1995) ( "[t]he policy behind Rule 408 is to encourage freedom of discussion with regard to compromise"). The integrity of the mediation process depends on the confidentiality of discussions and offers made therein. Because parties are generally entrenched in their adversarial roles, negotiations often include specific, creative recommendations *by the Court* on how to resolve disputes.

Order Re: Denying Petition to Vacate or Modify Confidentiality Order, at 3. Julian filed a notice of appeal on July 30, 2001, and this matter is timely before this Court under Fed. R. App. P. 4(a)(1)(A).

II.

We review the district court's decision on Julian's motion to vacate the confidentiality order for an abuse of discretion. *See, e.g.*, *First Tech. Safety Sys. v. Depinet*, 11 F.3d 641, 647 (6th Cir. 1993). The question of whether communications made in furtherance of settlement negotiations are *discoverable* by litigants in another action is a matter of first impression in this Circuit.

Rule 408 of the Federal Rules of Evidence provides that "[e]vidence of conduct or statements made in compromise negotiations is . . . not admissible." Fed. R. Evid. 408. However, Rule 408 "does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution." *Id.* Julian argues that the proscriptive portions of Fed. R. Evid. 408 apply only to admissibility at trial, and that statements made in furtherance of settlement negotiations are necessarily discoverable because Rule 408 provides for their use in some aspects of trial.

Rule 26(b)(1) of the Federal Rules of Civil Procedure provides that "[p]arties may obtain discovery regarding any matter, *not privileged*, that is relevant to the claim or defense of any party . . . ." Fed. R. Civ. P. 26(b)(1) (emphasis added). Accordingly, the right to discovery is not absolute. We must therefore first address whether settlement communications are privileged.

In *Jaffee v. Redmond*, 518 U.S. 1 (1996), the Supreme Court discussed at length the parameters of any recognizable privilege. Rule 501 of the Federal Rules of Evidence authorizes the federal courts to determine new privileges by examining "common law principles . . . in the light of reason and experience." Fed. R. Evid. 501; *Jaffee*, 518 U.S. at 8; *see also Wolfle v. United States*, 291 U.S. 7, 12 (1934). However, the *Jaffee* Court noted that, although Rule 501 references the common law, the rule "did not freeze the law governing the privileges of witnesses in federal trials at a particular point in our history, but rather directed federal courts to 'continue the evolutionary development of testimonial privileges.'" *Jaffee*, 518 U.S. at 8-9 (quoting *Trammel v. United States*, 445 U.S. 40, 47 (1980)). To be recognized, the asserted privilege must serve some public interest "transcending the normally predominant principle of utilizing all rational means for ascertaining truth." *Trammel*, 445 U.S. at 50 (quoting *Elkins v. United States*, 364 U.S. 206, 234 (1960) (Frankfurter, J., dissenting)). Moreover, the proposed privilege must promote a public interest that is "sufficiently important . . . to outweigh the need for probative evidence . . . ." *Id.* at 51; *see also Jaffee*, 518 U.S. at 11 (justifying need for psychotherapist privilege); *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981) (discussing policy reasons for attorney-client privilege); *Trammel*, 445 U.S. at 53 (discussing reasons for spousal privilege). Thus, the recognition of a privilege should be judged on a case-by-case basis and weighed against the public interest. *Jaffee*, 518 U.S. at 8; *see also* S. Rep. No. 93-1277, at 13 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7051, 7059. Viewed "in the light of reason and experience," we

believe a settlement privilege serves a sufficiently important public interest, and therefore should be recognized.

There exists a strong public interest in favor of secrecy of matters discussed by parties during settlement negotiations. This is true whether settlement negotiations are done under the auspices of the court or informally between the parties. The ability to negotiate and settle a case without trial fosters a more efficient, more cost-effective, and significantly less burdened judicial system. In order for settlement talks to be effective, parties must feel uninhibited in their communications. Parties are unlikely to propose the types of compromises that most effectively lead to settlement unless they are confident that their proposed solutions cannot be used on cross examination, under the ruse of "impeachment evidence," by some future third party. Parties must be able to abandon their adversarial tendencies to some degree. They must be able to make hypothetical concessions, offer creative *quid pro quos*, and generally make statements that would otherwise belie their litigation efforts. Without a privilege, parties would more often forego negotiations for the relative formality of trial. Then, the entire negotiation process collapses upon itself, and the judicial efficiency it fosters is lost.

Moreover, confidential settlement communications are a tradition in this country. *See, e.g.*, *Palmieri v. New York*, 779 F.2d 861, 865 (2d Cir. 1985) (citing *In re Franklin Nat'l Bank*, 92 F.R.D. 468, 472 (E.D.N.Y. 1981)) (stating that "[s]ecrecy of settlement terms . . . is a well-established American litigation practice "). This Court has always recognized the need for, and the constitutionality of, secrecy in settlement proceedings. In *In re the Cincinnati Enquirer*, 94 F.3d 198, 199 (6th Cir. 1996), and *Cincinnati Gas & Elec. Co. v. General Elec. Co.*, 854 F.2d 900, 903-04 (6th Cir. 1988), we denied members of the press access to pre-trial settlement procedures, relying on the historical secrecy in settlement talks. Although not recognizing a privilege as such, we stated that the need for privacy in settlement talks

outweighed any First Amendment right of access to the proceedings. In each case, we addressed whether there exists a right of access to summary jury trials. In *Cincinnati Enquirer*, we found that summary jury trials are essentially settlement proceedings, and that no "tradition of accessibility" exists because "[s]ettlement proceedings are historically closed procedures." *Cincinnati Enquirer*, 94 F.3d at 199. In *Cincinnati Gas & Elec.*, we found likewise, stating that "historically settlement techniques are closed procedures rather than open." *Cincinnati Gas & Elec.*, 854 F.2d at 903-04.

Other courts have gone further and recognized the existence of some sort of *formal* settlement privilege. In *Allen Cty. v. Reilly Indus., Inc.*, 197 F.R.D. 352 (N.D. Ohio 2000), the defendant filed a motion to compel discovery and sought to obtain the content of settlement negotiations between the plaintiff county and another defendant. The district court denied the request, noting the "well-established privilege relating to settlement discussions." *Id.* at 353 (citing *Cook v. Yellow Freight System, Inc.*, 132 F.R.D. 548 (E.D.Cal. 1990), *overruled on other grounds by Jaffee*, 518 U.S. 1). Likewise, in *Cook*, the court denied a third party's motion to compel discovery. The court found that not only are statements made in settlement negotiations privileged, but such statements come with no guarantee of veracity. As the *Cook* court stated:

> Settlement negotiations are typically punctuated with numerous instances of puffing and posturing since they are "motivated by a desire for peace rather than from a concession of the merits of the claim." *United States v. Contra Costa County Water Dist.*, 678 F.2d [90, 92 (9th Cir. 1982)]. What is stated as fact on the record could very well not be the sort of evidence which the parties would otherwise actually contend to be wholly true. That is, the parties may assume disputed facts to be true for the unique purpose of settlement negotiations. The discovery of these sort of "facts" would be highly

misleading if allowed to be used for purposes other than settlement. *See Wyatt v. Security Inn Food & Beverage, Inc.*, 819 F.2d 69, 71 (4th Cir. 1987).

*Cook*, 132 F.R.D. at 554. We agree with the reasoning of these lower courts. The public policy favoring secret negotiations, combined with the inherent questionability of the truthfulness of any statements made therein, leads us to conclude that a settlement privilege should exist, and that the district court did not abuse its discretion in refusing to allow discovery.

The fact that Rule 408 provides for exceptions to inadmissibility does not disprove the concept of a settlement privilege. Julian has not presented evidence of any case where the Rule 408 exceptions have been used to allow settlement *communications* into evidence for any purpose. Rather, the exceptions have been used only to admit the occurrence of settlement talks or the settlement agreement itself for "another purpose." *See, e.g., Breuer Elec. Mfg. Co. v. Toronado Sys. of Am., Inc.*, 687 F.2d 182, 185 (7th Cir. 1982) (holding existence of settlement negotiations admissible to rebut claim that party had no knowledge of suit); *Prudential Ins. Co. of Am. v. Curt Bullock Builders, Inc.*, 626 F. Supp. 159, 165 (N.D.Ill. 1985) (holding occurrence of settlement talks admissible to establish agency relationship); *see also Bank Brussels Lambert v. Chase Manhattan Bank, N.A.*, Nos. 93 Civ. 5298 and 93 Civ. 8270, 1996 WL 71507, at *6 (S.D.N.Y. Feb. 20, 1996) (compelling discovery of terms of agreement only); *Small v. Hunt*, 152 F.R.D. 509, 511 (E.D.N.C. 1994) (allowing discovery of settlement materials to show a "change in circumstances"). The confidentiality order does not prevent Julian from using the *existence* of *Goodyear I* settlement talks for "another purpose." For example, if a Goodyear representative claimed he had never met Chiles, Julian could rebut this contention, if it were relevant, by introducing evidence from the settlement talks as proof that each had negotiated with the other in Ohio. Thus, as with other privileges, the relationship itself is not

privileged, but only the underlying communications. *See Jaffee*, 518 U.S. at 15 (recognizing psychotherapist privilege only for "communications"); *Upjohn Co.*, 449 U.S. at 395-96 (stating that attorney-client privilege extends only to communications); *In re Grand Jury Proceedings*, 517 F.2d 666, 670-71 (5th Cir. 1975) (stating that identity of client and amount of fees is normally not privileged); *United States v. Goldfarb*, 328 F.2d 280, 282 (6th Cir. 1964) (implying that only communications are privileged); *Vinson v. Humana, Inc.*, 190 F.R.D. 624, 627 (M.D. Fla. 1999) (stating that information not pertaining to substance of communications is outside scope of privilege); *Vanderbilt v. Town of Chilmark*, 174 F.R.D. 225, 230 (D. Mass. 1997) (stating that "[f]acts regarding the very occurrence of psychotherapy, such as the dates of treatment, are not privileged"); *Kiermeier v. Woodfield Nissan, Inc.*, 1999 WL 759485, at *1 (N.D. Ill. Sept. 8, 1999) (holding identity of psychotherapist and dates of treatment not privileged).

The settlement privilege is also necessary because permitting third-party discovery of negotiation communications would lead to other undesirable results. In general, and in this case, there is no transcript of the settlement talks. And it is unlikely that there exist any written notes reflecting Goodyear's alleged attempt to bribe Chiles. Thus, in order to obtain or refute any evidence, the parties would have to depose each of the persons present at the negotiations. In this instance, that includes not only the representatives of Heatway and Goodyear, but the parties' lawyers and the district court judge himself.

The district court characterized Chiles' accusations as "out-of-turn comments made to the media shortly after his company lost a high-stakes trial," and therefore lacking in credibility. And although Rule 26 provides that discovery is permissible where it "appears reasonably calculated to lead to the discovery of admissible evidence," Fed. R. Civ. P. 26(b)(1), we have no reason to believe that Chiles' statement, itself of questionable credibility and not useable for any

substantive purpose, would lead to the discovery of any evidence that would be admissible.

In any event, even if negotiation communications were not privileged, Julian has not presented any evidence that the alleged statements are *relevant* to his Colorado case. Julian argues that evidence that might surface regarding Goodyear's alleged bribe attempt can be used to "impeach the credibility and demonstrate the bias or prejudice of those Goodyear witnesses who are put on the stand to 'toe the company line' concerning the supposed cause of the Entran II hose failure." Brief for Appellant, at 14. First, there is no point in introducing bias evidence against a party-opponent. Any Goodyear executive who takes the stand on Goodyear's behalf will be presumed biased in favor of the company position. *See, e.g.*, *Davis v. Rowe*, No. 91 C 2254, 1993 WL 34867, at *5 (N.D.Ill. Feb. 10, 1993) (stating that bias by party-opponent in favor of his own cause is assumed by the jury).

Second, Julian contends that he could use Chiles' statement as impeachment evidence against Goodyear executives who claim that the malfunctioning hoses were the fault of the homeowners. Although Julian is correct that questions of admissibility ultimately are decided by the trial court, *see* Fed. R. Evid. 104(a), it appears that this use would constitute an attempt to circumvent the Rules of Evidence and to utilize the statement for the substantive purpose of proving the exact question at issue, to wit, whether the hoses were defectively designed. Hence, the statement would likely be inadmissible under Rules 403[1] and 408. At best, the statement could have been used as impeachment evidence against Chiles had he accepted the alleged bribe and perjured himself in the Colorado case. But, even then, the evidence would merely be cumulative because Chiles' own deposition testimony, as well

---

[1] Fed. R. Evid. 403 provides that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ."

as the basis of Heatway's counterclaims in the Ohio case, would impeach Chiles' new story.

Moreover, one of the proposed rationales for the enactment of Fed. R. Evid. 408 was that statements made in furtherance of settlement are *never* relevant.  The advisory committee note to Rule 408 states that "exclusion may be based on" the fact that "[t]he evidence is irrelevant, since the offer may be motivated by a desire for peace rather than from any concession of weakness of position."  *See also Contra Costa County Water Dist.*, 678 F.2d at 92.  Even if Goodyear representatives had offered Chiles the alleged deal, any statements made in the course of negotiation are irrelevant for the purpose of impeaching a witness, because the offer of compromise does not reflect that Goodyear's hoses were defective.

In sum, any communications made in furtherance of settlement are privileged.  Moreover, any such statement is likely not relevant to Julian's case.  Julian has not demonstrated a legitimate, admissible use.  Therefore, we find no abuse of discretion in the district court's denial of Julian's motion to vacate or modify the order.

### III.

For the foregoing reasons, we **AFFIRM** the decision of the United States District Court for the Northern District of Ohio.