| | |
|---|---|
| PETROLEUM UNDERGROUND STORAGE TANK RELEASE COMPENSATION BOARD | Case No. 2017-00834PR |
| | Judge Dale A. Crawford |
| Plaintiff/Counter Defendant | DECISION |
| v. | |
| STANDARD OIL COMPANY, et al. | |
| Defendants | |
| and | |
| BP PRODUCTS NORTH AMERICA, INC. | |
| Defendant/Counter Plaintiff | |

{¶1} Plaintiff Petroleum Underground Storage Tank Release Compensation Board (the Board) and Defendants Standard Oil Company, BP Products North America, Inc., BP America, Inc., and Omega Oil Company (Defendants) have both moved for summary judgment. The motions have been fully briefed and the parties presented oral argument to the Court as well as additional briefs after oral argument. In support of their motions, the parties submitted evidence too voluminous to list individually. In all, the parties submitted over twenty depositions, several affidavits, and over 200 exhibits comprised of hundreds of pages of documents. For the following reasons, the Court shall grant Defendants' Motion for Summary Judgment and deny the Board's Motion for Partial Summary Judgment.

{¶2} The Board's second amended complaint delineates the following 6 claims: 1) fraud, 2) destruction of plaintiff's rights of subrogation, 3) indemnification, 4) quasi-contract/unjust enrichment, 5) negligent misrepresentation, and 6) declaratory judgment. The Court agrees with Defendants that the Board's claims all "turn on the

core allegation that Defendants had insurance that provided coverage for the same costs for cleaning up pollution" for which Defendants received reimbursement from the Ohio Petroleum Underground Storage Tank Financial Assurance Fund (the fund).

{¶3} Of the claims asserted in Defendants' counterclaim, only the breach of contract and unjust enrichment claims remain.[1] While Defendants' motion seeks summary judgment as to all of the Board's claims, the Board's motion seeks judgment only as to Defendants' request for attorney's fees as a remedy.

Civ.R. 56(C) states, in part, as follows:

> Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule. A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor.

See also Dresher v. Burt, 1996-Ohio-107, 75 Ohio St.3d 280 (1996). In Dresher, the Ohio Supreme Court held, "the moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record before the trial court which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." A "movant must be able to point to evidentiary materials of the type listed in 56(C)." Id. at 292.

---

[1]The Court has previously raised the issue of the court's subject matter jurisdiction which, in this case, results from Defendants counterclaim through which they seek compensatory damages primarily in the form of attorney's fees. The parties have agreed that they will not challenge the court's subject matter jurisdiction. However, subject matter jurisdiction is not waivable per Civ.R. 12(H)(3). Nevertheless, the Court continues to believe that it has subject-matter jurisdiction over the case pursuant to Defendants' counterclaim for money damages.

{¶4} When the moving party has satisfied its initial burden, Civ.R. 56(E) imposes a reciprocal burden on the nonmoving party.  It states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon mere allegations or denials of his pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the party does not so respond, summary judgment, if appropriate, shall be entered against the party.

In seeking and opposing summary judgment, parties must rely on admissible evidence. *Keaton v. Gordon Biersch Brewery Rest. Group*, 10th Dist. No. 05AP-110, 2006 Ohio 2438, 2006 Ohio App. Lexis 2287, ¶18.  The Court first considers Defendants' Motion for Summary Judgment.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
- **Facts**

{¶5} The fund, which the Board administers, reimburses gas station owner and operators for remediation and clean-up costs resulting from petroleum spills and leaks from underground storage tanks (USTs).  The fund is financed via annual fees, which tank owners pay into the fund.  Reimbursements are capped at $1 million and applicants seeking reimbursement must pay a $55,000 deductible.

{¶6} When seeking reimbursement, tank owners complete both an eligibility application and a reimbursement application.  As the fund does not reimburse costs covered by insurance, both applications ask tank owners about the existence of insurance.  The Board's exhibits 136-138 are eligibility applications which ask:

12) Is this release the subject of a filed third-party lawsuit or a settlement agreement?

13) Do you have coverage under any other forms of insurance * * * which you have or could make claim for reimbursement of costs of corrective action or third-party damages for the release which is the basis of your claim to the Financial Assurance Fund?

Likewise, the Board's exhibits 139-141 are example reimbursement applications which ask:

6)      Do you have coverage, other than for your deductible, under any other forms of insurance which you have or could make claim for reimbursement of costs for corrective action or third-party damages for the release which is the subject of this application?

7)      Has any suit been filed in which the owner and/or operator are attempting to recover the costs of performing corrective action or third-party damages associated with this claim?

8)      Has the owner and/or operator collected or does the owner and/or operator intend to collect money from any other source for the costs of performing corrective action or third-party damages associated with this claim?

In completing over 1,200 eligibility and reimbursement applications, Defendants answered "No" to these questions. Defendants have received $33.9 million in reimbursements from the fund and have applications pending for millions in additional reimbursements.

{¶7} Defendants' heritage entities, Sohio and Amoco, had an array of excess general liability insurance and captive insurance policies. Sohio, from 1985 forward, self-insured below $10 million per occurrence. From 1979 to 1985, Sohio's excess liability coverage did not attach below $6 million per occurrence. For costs above these amounts, Sohio bought third-party insurance. Beginning in 1971, these policies contained exclusions for leaks unless they were sudden and accidental. Beginning in 1986, these policies contained absolute pollution exclusions which barred coverage for any pollution claims including UST leaks. These policies also contained owned-property exclusions which excluded coverage for Sohio's own property.

{¶8} Beginning in 1979, Sohio used a wholly owned subsidiary named Monitor Insurance Limited (Monitor) and known as a "captive insurer" which provided coverage below the attachment points of its commercial insurance, i.e. $6 million from 1979 until

1985 and $10 million from 1985 onward. Monitor received all of its funding from Sohio and only covered liabilities of Sohio entities. It did not issue third-party insurance. Monitor issued policies directly to Sohio and reinsured policies issued by INA/Cigna. Monitor stopped issuing policies in 1994. Sohio did not submit claims for UST clean-up costs to Monitor. Messrs Kennedy, Evans, Bell, Tetlak, Rocco, Mancini, and Zigorski and Mses Hancock and Moore, all individuals familiar with Sohio's insurance arrangements, testified in deposition that Sohio did not have insurance for UST release clean-up costs.

{¶9} Amoco also purchased commercial excess general liability coverage insurance which provided coverage above significant self-insured retentions as follows: 1) $500,000 from 1959-1971, 2) $2,500,000 from 1971-1972, and 3) $5,000,000 from 1972-1985. Beginning in 1973, Amoco's commercial policies also contained a pollution exclusion which excluded coverage for claims that were not "sudden and accidental and, beginning in 1985, the policies contained the absolute pollution exclusion which barred coverage for all pollution claims including UST cleanup costs. As with Sohio, Messrs Teff and Wehr testified in deposition that Amoco had no insurance covering UST cleanup costs.

{¶10} Nonetheless, between 1997 and 2001, Sohio and Amoco engaged in settlement negotiations with their insurers.[2] As part of these negotiations, Sohio's consultants prepared a "Settlement Report" pertaining only to pollution in existence before May 1, 1986, in which the costs for thousands of gas stations were aggregated into one occurrence known as the marketing system. The insurers rejected this theory and Sohio withdrew the theory with the London Market, Sohio's largest insurer. Sohio

---

[2]The basis of the Board's claims rest on these settlement negotiations and the agreements resulting therefrom, evidence of which Defendants have asserted is inadmissible under Evid. R. 408. Though the Court agrees with Defendant's position as explained more herein, the facts relative to the settlement negotiations are necessary to explain the Board's claims as well as the arguments of the parties on summary judgment.

initially demanded $2 billion, reduced its demand to $1.3 billion after eliminating uninsured sites including gas stations, and eventually settled for $114 million. Sohio did not seek recovery from Monitor as part of these settlement negotiations.

{¶11} Amoco filed a lawsuit against its insurers. Several years into the litigation, Amoco retained the same consultants used by Sohio. The consultants again prepared a settlement report; it pertained only to pollution in existence before June 1, 1985. The settlement report included the marketing system theory which Amoco's insurers also rejected. Amoco made a demand of $2.9 billion, which excluded service stations, and ultimately settled for $206 million.

{¶12} In presenting the settlement reports to their insurers, Sohio and Amoco advanced arguments to overcome coverage defenses but did not disclose their negotiations to the Board. Both Sohio and Amoco's settlements expressly excluded amounts received from UST funds. However, UST claims were included in the release executed as part of the settlements with the London Market insurers.

- **The fund does not cover costs for releases before July of 1989.**

{¶13} Justice Scalia aptly described the appropriate method to use in interpreting the meaning of a statute in *Chisom v. Roemer*, 501 U.S. 380, 404, 111 S. CT. 2354, 2369 (1991) (Scalia, J. dissenting). As stated by Justice Scalia:

> first, find the ordinary meaning of the language in its textual context; and second, using established canons of construction, ask whether there is any clear indication that some permissible meaning other than the ordinary one applies. If not -- and especially if a good reason for the ordinary meaning appears plain -- we apply that ordinary meaning.

{¶14} To be eligible to reimbursement from the fund, R.C. 3737.92(D)(1) provides, "[a]t the time that the release was first suspected or confirmed, a responsible person possessed a valid certificate of coverage issued by the board under division (D) of section 3737.91 of the Revised Code for the petroleum underground storage tank

system from which the release occurred." In *Amoco v. Petroleum Underground Storage Tank Release Bd.,* 89 Ohio St.3d 477, 481 (2000), the Supreme Court interpreted R.C. 3737.92(D)(1)'s language and found it "unambiguously places an obligation on the Director to determine the origin of the release" and that "the Director is responsible for tracing a release to the leaking tank in order to make sure the release occurred from a tank with a valid certificate of coverage." As noted in *Amoco,* R.C. 3737.91 did not become effective until July 11, 1989.[3] Statutes operate prospectively and the Court finds R.C. 3737.92(D)(1)'s language lacks a clear intent to cover releases predating the statute. The fund did not exist before July 11, 1989, could not issue certificates of coverage before this date and, therefore, could not cover releases which occurred before this date. Further, O.A.C. 3737-1-09(A)(1) provides reimbursement is not authorized for "[c]osts of corrective actions for releases prior to July 1, 1989." Thus, regulations the Board enacted pursuant to the Board's legislatively delegated authority explicitly prohibit reimbursement for pre-July 1989 releases. The plain language of the statutes and regulations under which the fund is administered exclude reimbursement for costs incurred before July 11, 1989. They are clear and unambiguous and, therefore, the guidance and opinion evidence the parties provide is not relevant to determine the statute's intent. However, the Court notes that the evidence establishes that the Board acted consistently with the Court's interpretation of the statute.

---

[3]Moreover, O.A.C. 3737-1-03(24) and 1301-7-9-13(26) together define release as "[a]ny spilling, leaking, emitting, discharging, escaping, leaching or disposing of a petroleum product from an UST system into the groundwater, a surface water body, subsurface soil or otherwise into the environment." O.A.C. 3737-1-03(28) and 1301-7-9-13(35) together define suspected release as "evidence of a release obtained through * * * (a) monitoring results * * * (b) reportable failed tightness test * * * (c) unusual operating conditions observed by the owners and operators * * * (d) the presence of free product discovered in the containment sump or the interstitial space of the UST system * * * or (e) physical discovery." Thus, the Court agrees with Defendants' position that these regulatory definitions make clear that when a suspected release occurred is not dependent on a tank owner's subjective suspicion but rather on objective evidence of a release such as the results of testing or firsthand observation of certain conditions.

{¶15} Given the above, the Court finds Defendants' insurance policies which provided coverage before July 11, 1989 could not have covered any costs the fund reimbursed because releases prior to this date are not eligible for reimbursement.

- **Sohio's Monitor Insurance did not provide coverage.**

{¶16} The Court has determined claims for releases prior to July 1, 1989 are not eligible for reimbursement under the statute.   Therefore, the only issue remaining is which, if any, post July 1, 1989 claims were made for which Defendants had insurance. The Board has not identified any post-1989 policies of Amoco which it argues provided coverage and it is undisputed that Amoco's policies contained the absolute pollution exclusion from 1985 onward.  Thus, the only possibility for coverage would be through Monitor, which only provided insurance to Sohio.   Defendants presented undisputed evidence that Sohio never made any claim or demand to Monitor and that Monitor never paid for UST cleanup costs which placed the burden on the Board to demonstrate coverage.  The Court finds that the Board did not meet its reciprocal burden.

{¶17} In fact, the Board, in its supplemental brief, provided an example of a specific site as well as a Monitor policy which the Board asserts provided coverage and which example the Board also asserts constitutes *prima facie* proof of fraud.  However, the Court finds this example does not demonstrate the existence of any genuine issue of material fact regarding insurance coverage.  By its plain terms, the example Monitor policy provides coverage only for third-party claims and off-site cleanup of pollution.    It does not cover cleanup costs that the Board reimbursed.

{¶18} The Court finds that the Board failed to show Monitor's coverage applied to any claim the Board asserts was fraudulently made.

- **Evidence from Defendants' settlement negotiations is inadmissible pursuant to Evid. R. 408.**

{¶19} Defendants supported their motion with proper Civ.R. 56(C) evidence which established that they did not have insurance when they completed their applications for reimbursement. The burden then shifted to the Board to point to proper evidence demonstrating Defendants had insurance covering cleanup costs and also that they knew they had insurance. The Board offered no such evidence. Instead, the Board primarily relied on the settlement evidence. Defendants assert the settlement evidence is inadmissible and, therefore, cannot create a genuine issue of material fact. The Court agrees.

Evid. R. 408 provides:

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

The staff notes explain the rule's underlying policy in that "compromise may be based upon considerations other than liability and * * * compromises of disputes should be encouraged as a matter of policy."

{¶20} The point of 408's prohibition is to protect and ensure the integrity of the settlement and mediation process by protecting the statements made therein. The rule protects communications, not parties. In fact, courts have gone even farther in protecting communications made during settlement negotiations. In *Goodyear Tire and Rubber Co. v. Chiles Power Supply, Inc.* 332 F.3d 976, 981, (6th Cir.2003), the 6th

Circuit upheld a trial court's refusal to allow discovery of settlement communications, finding that such communications are privileged. In reaching this holding, the 6th Circuit cited, with approval, the reasoning of a California district court decision which, in this Court's view astutely recognizes the reality of settlement discussions and the reasons underlying the privilege established by the 6th Circuit and the prohibition set forth in Evid. R. 408. In the California case, *Cook v. Yellow Freight Sys., Inc.*, 132 F.R.D. 548 (E.D. Cal. 1990), the court reasoned:

> Settlement negotiations are typically punctuated with numerous instances of puffing and posturing since they are "motivated by a desire for peace rather than from a concession of the merits of the claim." What is stated as fact on the record could very well not be the sort of evidence which the parties would otherwise actually contend to be wholly true. That is, the parties may assume disputed facts to be true for the unique purpose of settlement negotiations. The discovery of these sort of "facts" would be highly misleading if allowed to be used for purposes other than settlement. (Internal cites omitted).

{¶21} The Ohio Supreme Court recognized the same purpose in *Sherer v. Piper & Yenney*, 26 Ohio St.476, 478-479 (1875). In holding that evidence of a settlement offer was incompetent evidence, the Court reasoned, "[a]n offer to compromise, made * * * for the purpose of buying peace and avoiding litigation" should be excluded on public policy grounds because "without this protective rule, it would be difficult to take any step toward an amicable adjustment or compromise."

{¶22} Further, as stated in *Lewis v. Alfa Laval Separation*, 128 Ohio App.3d 200, 207 (4th Dist.1998), "[t]he rule applies not only to evidence of a settlement between the parties, but also to evidence of a settlement between a party and a non-party." *See also Fireman's Fund Inc. Co. v. BPS Co.,* 23 Ohio App.3d 56, 61-62 (10th Dist.1985); *Cummins v. Great Door Supply, Inc.,* 7th Dist. No. 02 CA 61, 2003-Ohio-4455, ¶ 19. In construing the analogous federal rule, the Federal Circuit Court of Appeals has also found that "[t]he rule is clear by its text and history that it covers not only settlements

and negotiations between parties to the lawsuit, but also settlements and negotiations involving a third party." *In re MSTG, Inc.*, 675 F.3d 1337, 1344 (Fed. Cir. 2012). *See also Fed. R. Evid. 408* Advisory Committee Notes ("While the rule is ordinarily phrased in terms of offers of compromise, it is apparent that a similar attitude must be taken with respect to completed compromises when offered against a party thereto. This latter situation will not, of course, ordinarily occur except when a party to the present litigation has compromised with a third person.")

{¶23} Here, despite the Board's assertions to the contrary, the Board is offering the settlement evidence for the exact reason that such evidence is deemed inadmissible under Evid. R. 408, i.e. to establish Defendants' liability by showing that they knowingly failed to disclose insurance which covered costs the fund reimbursed. In fact, the Board states, "the Settlement Evidence will be offered to show that * * * BP knew its insurance claims and settlements encompassed the same claims the Board reimbursed." The Court finds that the settlement evidence is inadmissible pursuant to Evid. R. 408 and, therefore, cannot be considered on summary judgment.

- **The Board has not identified insurance covering any specific site for which Defendants obtained reimbursement.**

{¶24} In addition, while not necessary to dispose of the Board's claims in this case, the Court also agrees with the coverage analysis set forth in the South Dakota trial court decision cited in Defendants' briefing, *South Dakota Petroleum Release Compensation Fund v. BP, et al.,* Hughes County File No. 10-257 (Jan. 13, 2019) (Ex. 64 to Defendants' Motion for Summary Judgment). As did the plaintiff in the South Dakota case, the Board here has not identified any specific policies covering any particular site for which Defendants were reimbursed other than the example site and Monitor policy discussed *supra*. Rather, as in the South Dakota case, the Board relies on the opinion of its expert, Garth Allen, regarding "potential coverage." The Court agrees with the South Dakota court's analysis of Mr. Allen's opinion as well as its

construction of insurance policy language including the pollution and owned property exclusion provisions.

{¶25} The questions posed on the fund's applications did not ask if Defendants had the potential for coverage under any policy or form of insurance which they owned. Rather, the questions asked about the existence of insurance covering the same costs for which Defendants sought reimbursement. The "could make claim" language, in the Court's view, does not ask about the possibility of coverage under any form of insurance or if there is an argument under which coverage might be sought. Rather, it seeks information on Defendants' insurance covering cleanup costs for which Defendants could but had not yet made a claim.

{¶26} Anyone can make a claim. The issue is not whether Defendants could have made a claim with their insurers. The issue before the Court is whether Defendants had a claim with merit against their insurers. On this issue, the Court finds that there are no genuine issues of material fact. Defendants did not have insurance that provided coverage for the same clean-up costs for which they received reimbursement from the fund. The Court is granting Defendants' motion due to the lack of evidence supporting the Board's generic assertion, underlying all the Board's claims, that Defendants had insurance when they sought reimbursement from the fund. Defendants demonstrated there is no genuine issue of material fact that they did not have insurance and, therefore, answered the application questions correctly.

## THE BOARD'S MOTION FOR PARTIAL SUMMARY JUDGMENT

{¶27} The Board moved for summary judgment on Defendants' request for attorney's fees as compensatory damages for the alleged breach of lump sum settlement agreements. The facts germane to this claim are limited. Between 2004 and 2010, the Board and Defendants entered into four separate settlement agreements, which settled hundreds of reimbursement claims for $5 million. In exchange, the Board

agreed to "forego any additional reimbursement review of the Claims" compromised through these agreements. Defendants assert the Board has breached these lump sum settlement agreements through its prosecution of the present case. [4]

{¶28} The Board argues that Defendants are not entitled to attorney's fees as a matter of law. However, the Court disagrees and, based on the law set forth in *Shanker v. Columbus Warehouse Ltd. Partnership*, 10th Dist. No. 99AP-772, 2000 Ohio App. Lexis 2391, finds that there are material issues of fact regarding whether Defendants are entitled to recover attorney's fees as compensatory damages for the alleged breach of the lump sum settlement agreements and that the Board is not entitled to judgment as a matter of law. The Court, of course, is not deciding the merits of Defendants' counterclaims and expresses no opinion at this time as to whether the Board breached the settlement agreements.

**CONCLUSION**

{¶29} The parties did not brief the Board's claims separately. Rather, the parties have argued the case based on the premise that all the Board's claim rest on the core allegation that Defendants had insurance that they failed to disclose. For the foregoing reasons, the Court finds that Defendants met their burden and established an absence of any genuine issue of material fact regarding the lack of available insurance coverage. Therefore, Defendants' Motion for Summary Judgment shall be granted.

---

[4]Regarding the claims covered by the lump sum settlement agreements upon which Defendants' breach of contract counterclaim is based, the Court finds the Board needed to rescind the settlement agreements to seek the money paid out under these agreements. *See Berry v. Javitch, Block & Rathbone,* 127 Ohio St.3d 480 (2010). However, the Court is dismissing all the Board's claims for the reasons noted herein and, therefore, need not explicitly decide this issue.

{¶30} Further, under Ohio law, attorney's fees are recoverable in a breach of contract action premised on the alleged breach of a settlement agreement and the Board's Motion for Partial Summary Judgment shall be denied.


DALE A. CRAWFORD
Judge

[Cite as *Petroleum Underground Storage Tank Release Comp. Bd. v. Std. Oil Co.*, 2019-Ohio-2455.]

| | |
|---|---|
| PETROLEUM UNDERGROUND STORAGE TANK RELEASE COMPENSATION BOARD | Case No. 2017-00834PR |
| | Judge Dale A. Crawford |
| Plaintiff/Counter Defendant | <u>JUDGMENT ENTRY</u> |
| v. | |
| STANDARD OIL COMPANY, et al. | |
| Defendants | |
| and | |
| BP PRODUCTS NORTH AMERICA, INC. | |
| Defendant/Counter Plaintiff | |

{¶31} For the reasons set forth in the decision filed concurrently herewith, Defendants' Motion for Summary Judgment is GRANTED and the Board's Motion for Partial Summary Judgment is DENIED.

DALE A. CRAWFORD
Judge

**Filed May 17, 2019**
**Sent to S.C. Reporter 6/20/19**